## ELLISON v. CHARBONNEAU.

### No. 13469.

Court of Civil Appeals of Texas. Fort Worth.

Dec. 11, 1936.

Rehearing Denied Jan. 22, 1937.

McDonald & Floyd, of Ft. Worth, for plaintiff in error.

Leroy A. & Van Zandt Smith, of Ft. Worth, for defendant in error.

DUNKLIN, Chief Justice.

On November 20, 1930, W. F. Charbonneau executed a written lease to T. B. Ellison to the following described tract of land: "Beginning at a point on the contemplated south line of the 9 Mile Bridge Road, said point of beginning being 21 feet south and 2359.8 feet north 89½ degrees west of the northeast corner of the M. Townsend Survey; thence with a curve·having a central angle of 142 degrees 45' and a radius of 54.3 feet, 135 feet to the end of said curve; ·thence south 51 degrees 45' east 200 feet to a stake in the north line of the New Jacksboro Highway; thence north 18 degrees 25' east 233 feet to a stake in the said contemplated south line of the said 9 mile Bridge Road and being also 21 feet south of the north line of the M. Townsend Survey; thence north 89 degrees 80' west 200 feet to the place of beginning."

The lease was for a term of 15 years, for which the lessee agreed to pay an annual rental of $500, payable in advance, beginning on the 20th day of November, 1930, and ending the 20th of November, 1945, with option to the lessee to án extension of the lease for 10 years additional for an annual rental of $700 in advance. The lease contained this further provision: "Until the 9 Mile Bridge Road is actually widened lessee will have exclusive right of ingress and egress over the 21 foot strip. between said road and above described land, but this right will not interfere with the widening of said

road and any compensation paid by the County for such strip will belong to lessor."

The land so leased to Ellison abutted on the Fort Worth-Jacksboro Highway and extended in a southerly direction along said highway from a point 21 feet south of the south line of the 9 Mile Bridge road where it intersected with the Fort Worth-Jacksboro Highway, and in an easterly direction along the south line of the 9 Mile Bridge road.

The 9 Mile Bridge road extended from its intersection with the Fort Worth-Jacksboro Highway in an easterly direction a distance of 3 miles to what is known as Azle avenue in Fort Worth, and from there in a southerly direction to the city of Fort Worth.

On December 30, 1930, the commissioners' court of Tarrant county passed a resolution for the widening and paving of the 3-mile strip of the 9 Mile Bridge road already mentioned. That resolution was passed upon the petition of ten landowners, including W. F. Charbonneau, who was the fee owner of all the land lying south of and adjoining that 3-mile strip of road. The application for that improvement embodied this proposition: "We each hereby agree in addition to any other endeavor that we can put forth, to donate adequate right-of-way and in every way adjust all damages reasonably, in an effort to co-operate in carrying out this project of the highest type at minimum cost and with the greatest possible dispatch."

The resolution passed by the commissioners' court in granting that application provides that: "The type of said entire three miles section is hereby adopted as a 60 foot street section job on a 100 foot wide right of way."

With this further provision: "It is understood that the owners of the property abutting said section will forthwith deed to Tarrant County or the State of Texas sufficient additional land, without cost, to make the right of way for said section 100 feet wide. Provided, however, Tarrant County is to pay for moving and resetting fences and other improvements that may be necessary to remove from said right of way; the conveyance of said land without cost being in consideration of the changed plans and the extra benefit such property owners will receive

by reason of the construction of a higher type road."

In order to carry out the requirements of the commissioners' court, it became necessary to add 40 feet to the width of the 3-mile strip of road as already established, and it was contemplated that 20 feet would be added to each side.

Mr. Gamble, the owner of the land on the north side of the highway opposite the Ellison tract, objected to giving 20 feet off his side because it would make the road too close to his buildings. In order to help the county out and to assist the north side citizens to get a connection with the Jacksboro Highway, and fearing that the county might have some trouble in getting the 20 feet from Gamble, Charbonneau then agreed with the commissioners' court that 40 feet be taken off his land south of the right of way, and on May 16, 1932, he executed to the county a right of way deed to that 40 feet with warranty of title. The 40 feet thus added included the 21-foot strip theretofore lying between the Ellison tract and the right of way of the road as theretofore constructed, and about 18 feet additional off the Ellison tract. The land leased by Ellison covered an area of about one acre, and it was leased for the purpose of display on signboards, to be erected thereon, advertisements of the Ellison Furniture & Carpet Company.

During the month of September, 1932, the county, acting through its commissioners' court, proceeded to widen and improve the 3-mile strip of road and took possession of the 40 feet so conveyed to it by Charbonneau, including the 18 feet off the Ellison lease, and tore down a fence which Ellison had erected on the north boundary of that portion of his leased premises, and used by him for display of business advertisements of the Ellison Furniture & Carpet Company.

This suit was instituted by Charbonneau to recover the annual rental installments of $500 each, falling due under the terms of the lease contract on November 20, 1932, November 20, 1933, and November 20, 1934, respectively.

Recovery was sought against Mrs. Annie A. Ellison as independent executrix of the estate of T. B. Ellison, deceased, under allegations that T. B. Ellison died December 28, 1932, leaving a will in which his son Robert Ellison was named as in-

312

dependent executor. That Robert Ellison died after he had qualified as such executor, and under the terms of the will and appointment by the probate court, Mrs. Annie A. Ellison became the independent executor of the estate of T. B. Ellison, deceased.

Defendant pleaded that the deed executed by plaintiff to the county to the 18 feet off the lease and taking possession thereof by the county under that deed, amounted to a breach by plaintiff of his implied warranty of peaceable possession of the entire premises covered by the lease, and therefore plaintiff could not recover the rentals sued for.

Defendant further alleged that T. B. Ellison was evicted from the leased premises during the year beginning November 20, 1931, for which plaintiff had received $500 as rental in advance.

There was a prayer for recovery of the amount so paid. Defendant further prayed for a decree adjudging that defendant is not liable for further rentals thereunder.

By supplemental petition plaintiff alleged that at the time he executed to Tarrant county the 18-foot strip off the premises theretofore leased to Ellison, the county had notice of the lease to Ellison, which had been duly recorded in the deed records of the county, and also notice that Ellison had fenced the leased premises and was in open adverse possession thereof with his advertising signs displayed on fences inclosing the same; and therefore plaintiff's deed to the county of that strip did not in any way interfere with or convey any rights theretofore acquired by Ellison under his lease; with further allegations that at the time plaintiff executed the deed to the county he expected and believed the county would, by condemnation proceedings or by amicable settlement, acquire from Ellison the right to so use the 18 foot strip for highway purposes contemplated.

Plaintiff presented a further special plea as follows:

"That the said Ellison, if he ever had any right to object to plaintiff's deed, which is denied, waived the same after the execution thereof and before the actual taking of the strip of land in question by the county, by consent to the county, through its duly authorized county engineer, Wesley Stevens, of its use of said strip on condition that plaintiff would include in his said lease a strip of land adjoining the same

on the east thereof of equal area and frontage on the Jacksboro Highway, which fact being communicated to the plaintiff the latter offered to convey to the said Ellison the said additional strip on the east, but the said Ellison at that time had changed his mind and refused to accept the same. That plaintiff, although not required so to do under the law, has been at all times and is now ready, able and willing to make conveyances so as to include said additional land in said lease and now here tenders such a conveyance to the defendant.

"That the taking of said property by the county for the purposes of widening and improving said road did not damage or injure the said Ellison's leasehold property, but, on the contrary, increased the value thereof, in this, that the widened roadway and new pavement attracted more passersby and thereby added greatly to the value of said lease."

The case was tried to a jury and at the conclusion of the evidence, the court overruled defendant's request for an instructed verdict in her favor. The court then instructed the jury to return a verdict in favor of plaintiff against the defendant, as independent executrix of the estate of T. B. Ellison, deceased, for the sum of $1,500, together with interest in the sum of $179.-76.

The judgment rendered was in favor of plaintiff for the amount so found by the jury and denying defendant's cross-action, but with this further decree: "It is further ordered, adjudged and decreed by the Court that the plaintiff comply with his tender made in his pleadings in this cause by executing in favor of the defendant an instrument in writing, properly acknowledged, leasing to the defendant in her capacity as foresaid, same to be subject to the terms in all respects of the original lease and to become a part thereof, a strip of land on the east side of said tract and adjacent thereto of the same area as that which was taken by the County from the leased premises, and fronting on Jacksboro Highway, and that such instrument be delivered to the clerk of the defendant."

The deed from Charbonneau to the county was drawn up by the county's legal department and executed without the knowledge or consent of T. B. Ellison. It included also a strip of like width across the north side of other lands owned by Charbonneau of approximately 800 acres. Charbonneau testified that at the time of its

execution "there was mention made of the Ellison lease and that the county would have to deal with him in regard to it," and further, that the county paid him nothing for it. The deed recited: "It is further stipulated that the right-of-way for such road and highway is given and donated hereby."

Also a stipulation that the grantor would "warrant and forever defend all and singular the said land unto said Tarrant County, and its successors against every person whomsoever lawfully claiming, or to claim the same, or any part thereof."

The commissioners' court delegated to Wesley Stevens, the county engineer, the matter of widening and paving the 3-mile strip of the 9 Mile road, and he and Ab Fitts, who was employed to assist him, testified as witnesses for plaintiff. According to the testimony of Stevens, after plaintiff had executed to the county his deed of right of way to a 40-foot strip south of and adjoining the former right of way of the 9 Mile road, which included approximately 18 feet off the Ellison lease, and before beginning the work of widening the old road, he took up with T. B. Ellison the matter of getting his consent to the inclusion of said 18-foot strip, and drove with him out to the place where the matter was discussed, and on that occasion Ellison said to him, in substance, he would be willing for the county to include that 18-foot strip within the right of way of the new road if plaintiff Charbonneau would, as a substitute therefor, convey to him another strip of like area to include a certain tree not included in the 18-foot strip. Witness told him in reply he did not believe that proposal would be acceptable to Charbonneau because the proposed strip would embrace too much land; that the proposal was later rejected by Charbonneau by reason of that fact, and when he reported that decision to Ellison the latter refused further negotiations, looking to a relinquishment of his leasehold interest. According to his further testimony he understood from Ellison that any agreement for such an exchange would have to be in writing.

Stevens, the county engineer, further testified that after those negotiations had come to naught, he proceeded with the widening and paving of the 9 Mile Bridge road, and the county then tore down Ellison's fence inclosing the 18-foot strip on the north, took possession of that strip as a part of the new highway, which it widen-ed and paved, and the county has used it as such ever since.

Ab Fitts testified that he too made an effort to get Ellison to agree to take from Charbonneau another strip in lieu of the 18-foot strip in question, and took Charbonneau with him to see Ellison concerning the matters, but they failed to reach any agreement with Ellison whereby he would accept from Charbonneau the lease to another strip of land in lieu of the 18-foot strip in question, which was tendered in plaintiff's supplemental petition and which Charbonneau had already executed and acknowledged. And at the conclusion of the negotiations Ellison told Charbonneau he would refuse to make any further payment on his rental contract and wanted the lease canceled.

The testimony of those two witnesses was introduced by plaintiff in support of the alleged parol agreement of Ellison for a modification and change of his lease. Defendant objected to its introduction on the ground that such testimony was incompetent because in contravention of the statute of frauds (Vernon's Ann.Civ.St. art. 3995); and we believe the court erred in overruling the objection so made, for reasons expressed in a subsequent portion of this opinion.

E. G. Wallace, another witness for plaintiff, testified to a conversation with Ellison with reference to the taking by the county of the 18-foot strip, and that Ellison said to him: "Mr. Charbonneau was going to give him some more land back of it for the space they took."

"Q. Did he say that was satisfactory with him? A. He did not say. He just said that they were going to give him some land for that the county took and that was all there was said about it."

While the statute of frauds was not invoked by defendant as ground for objection to that testimony, it was not competent evidence, of itself, to support plaintiff's allegation of modification of the lease because it was too indefinite to identify the strip to be substituted.

The record shows that the area of the leased premises was approximately one acre. Stevens testified that the area of the strip in controversy was approximately .086 of an acre. Wallace, witness for plaintiff, testified that the taking of that strip would depreciate the rental value of the whole lease at least 10 per cent. According to testimony of Nowlin, witness for defend-

ant, the rental value of the lease was depreciated 30 or 40 per cent., and according to testimony of McEntire, another of defendant's witnesses, the depreciation was about one-third. Testimony of Blanton, witness for plaintiff, was to the effect that damage to the entire lease by taking the strip would not exceed 5 per cent. of its value. The evidence showed that the northerly boundary line of Ellison's lease was in fact shortened by the change, and the value of the lease depended principally on the length of the boundary lines for advertising purposes rather than on the value of the land within those boundaries. Further, the testimony referred to apparently had no reference to the value of Ellison's fence that was taken down by the county in widening the highway.

Plaintiff tendered into court the deed he had executed to substitute the land therein described for the 18-foot strip taken by the county, and testified that he was still willing to deliver to defendant that instrument to accomplish that purpose.

"As a primary rule, it is to be noted that a covenant for quiet enjoyment is embodied in a lease contract by implication from the words 'demise' and 'lease.' The rule is stated: 'Though a lease may not contain an express covenant for the quiet possession and enjoyment of demised premises during the term thereof, the law always implies such a covenant.' The agreement which is thus implied on the part of the lessor is that the lessee shall not be evicted or disturbed by the lessor or by any person deriving title from him or by one having a title which is paramount to that of the lessor." 27 Tex.Jur. p. 269.

"It is always to be implied, in the absence of a stipulation to the contrary, that the tenant shall have the entire occupancy and use of the whole of the rented premises, and if he is ousted from any material part thereof he may treat such interference by the landlord as an eviction and abandon the lease." 36 Corpus Juris, § 981, p. 256.

■ "Although the mere making of another lease during the term does not constitute actual eviction of the existing lessee, a tenant is evicted where, before the expiration of his lease, the landlord rents the demised premises to another person, who takes possession of them without the tenant's consent." 36 Corpus Juris, § 984, p. 260. See, also, 36 C.J. pp. 76, 78 and 80, and sect. 979, p. 255; Edmison v. Lowry,

13 S.D. 77, 52 N.W. 583, 17 L.R.A. 275, 44 Am.St.Rep. 774; Smith v. McEnany, 170 Mass. 26, 48 N.E. 781, 64 Am.St.Rep. 272; Collins v. Lewis, 53 Minn. 78, 54 N. W. 1056, 19 L.R.A. 822; Weinman v. De Palma, 232 U.S. 571, 34 S.Ct. 370, 58 L. Ed. 733; Kuschinsky v. Flanigan, 170 Mich. 245, 136 N.W. 362, 41 L.R.A.(N.S.) 430, Ann.Cas.1914A, 1228.

■ Tested by the foregoing authorities, the facts recited above conclusively establish an eviction of the lessee Ellison by the county, with the authority and consent of plaintiff from a substantial portion of the rented premises, and by reason thereof the lessee had the right to abandon the whole, and refuse payment of further rents.

■ It is true, as insisted by appellee, that under the provisions of article 1290, Rev.Civ.Statutes, of 1925, the right of way deed executed by plaintiff to the county conveyed no greater interest than the grantor owned and did not in law operate as a conveyance of the leasehold interest theretofore conveyed to Ellison and actual notice of which the county then had; yet that fact was no answer to the allegation sustained by uncontroverted proof, that the eviction by the county was under and by virtue of plaintiff's deed to the county; the testimony of Stevens showing that the eviction occurred after he had made an unsuccessful effort to induce Ellison to agree to accept from plaintiff another strip in lieu of the 18-foot strip in question. If that statute would defeat the defense of eviction under the facts stated, then it would logically apply also if the eviction had been by Charbonneau himself rather than by the county—which, manifestly, would be untenable. In other words, the act of eviction should not be confused with the lack of right to evict.

■ Nor is it of any moment that the county might not have a right to recover of plaintiff on his covenant of warranty of title for the loss of the strip in question, since the county had paid Charbonneau nothing for that conveyance, as further insisted by appellee.

Authorities cited by appellee, based on the provisions of article 1290, Rev.Civ. Statutes, cited above, in suits for title and suits for damages by the tenant against the landlord for breach of his covenant for peaceable possession of leased premises, are not applicable to the relief sought by appellant in this suit.

The following are authorities cited by appellee to support his special defense of an alleged agreement of Ellison to accept from plaintiff other land in lieu of the 18-foot strip:

Bennett v. Giles (Tex.Civ.App.) 12 S.W. (2d) 843, was a suit to recover the value of fuel oil sold by plaintiff to defendant. One of the defenses was that plaintiff had agreed to accept from defendant an oil and gas lease in payment for the oil sold, and he tendered performance by his conveyance of that lease. Since the suit was for the debt due for the fuel oil sold and not for enforcement of a parol agreement to convey the lease, it was held that the statute of frauds invoked by plaintiff to defeat the defense urged had no proper application.

The decision in Bishop v. Williams (Tex. Civ.App.) 223 S.W. 512, 513, was to a like effect, as shown in the following statement in the headnotes: "That contract to convey was in parol did not render deed executed pursuant thereto invalid under the statute of frauds; the parol contract not being void, but merely unenforceable, and vendor having waived benefit of the statute by complying with the contract and executing the deed."

The point decided by the Commission of Appeals in Simpson v. Green, 231 S.W. 375, was that a deed executed and deposited in escrow, to be delivered upon payment of the money consideration recited in the deed, was a sufficient memorandum in writing to meet the statute of frauds, since it was the oral contract of sale to be enforced and not the memorandum evidenced by the deed.

We believe it manifest that those decisions are not in point here, since the alleged parol agreement of Ellison to surrender his leasehold on the 18-foot strip, even if made, which the evidence failed to show, was unenforceable by reason of the statute of frauds, and that was the agreement which plaintiff sought to enforce. Charbonneau's agreement to convey another strip in lieu of the 18-foot strip was in consideration for that alleged agreement of Ellison.

Since the evidence showed without controversy that the eviction by the county was under and by virtue of Charbonneau's right of way deed to the county executed with his purpose and intent that the disputed 18-foot strip included in that deed would be used by the county for widening the highway, it follows that the eviction was in law chargeable to Charbonneau, plaintiff in this case. And since plaintiff failed to sustain his special plea of the alleged agreement of Ellison to accept from him the conveyance of another strip in lieu of the 18-foot strip so taken, we conclude that the court erred in refusing defendant's request for an instructed verdict in his favor as against plaintiff's suit and for cancellation of the lease and the unpaid rental installments, sought in defendant's cross-action.

Accordingly, the judgment of the trial court is reversed and judgment is here rendered denying plaintiff any recovery of defendant and sustaining the defendant's cross-action for cancellation of the lease and all of Ellison's unpaid obligations given therefor, but denying defendant's further prayer for recovery of the last installment of rent paid, since the evidence was insufficient to establish that claim.

On Motion for Rehearing.

Complying with a request therefor by appellee, following are facts additional to those shown in the opinion of this court on original hearing:

The lease from Charbonneau to Ellison was duly acknowledged and filed for record in the deed records of Tarrant county on November 24, 1930; at the time Charbonneau executed to the county the right of way to the property owned by him, which included the 18-foot strip in controversy, Ellison was in open adverse possession of that strip, holding the same under a fence. At the time Charbonneau signed the right of way deed in question to the county, with a stipulation therein of warranty of title to the right of way so conveyed, he orally informed Stevens, the county engineer in charge of the improvement of the road, of the existence of Ellison's lease and that the county would have to deal with Ellison in regard to it. Before the county took possession of the 18-foot strip of Ellison's lease in controversy, Stevens made an unsuccessful effort to induce Ellison to accept from Charbonneau another strip in lieu of that 18-foot strip. Charbonneau took no part in the act of the county in actually tearing down Ellison's fence with his advertising signs thereon and constituting a part of the inclosure of the 18-foot strip; that fence was torn down by the county and possession taken of the 18-foot strip during the month of October, 1933, and Ellison's advertising signs on the remaining portion of the lease were not removed until

about April or May of the following year. However, in connection with this finding, we will add that before Ellison was evicted from the 18-foot strip, he notified Charbonneau of his intention to abandon the entire lease by reason of the taking of that strip by the county. We will further add that no condemnation proceedings were ever instituted by the county against Ellison for the 18-foot strip in controversy. And that strip was taken by the county without compensation to Ellison and as a part of a long-distance strip owned by Charbonneau and others abutting on the highway, all as contemplated by the preliminary agreement of those owners with the county to donate the same without cost to the county, in consideration of the agreement of the county to widen the highway so as to include that strip, and which agreement was duly performed by the county. The 18-foot strip was a substantial and valuable part of the land leased by Charbonneau to Ellison.

Plaintiff's suit was to recover the full amount stipulated in Ellison's contract with no abatement of that amount by reason of Ellison's loss of his lease on the 18-foot strip.

The defendant pleaded the eviction of Ellison from the 18-foot strip by the county, with authority and approval by Charbonneau, evidenced by Charbonneau's preliminary written agreement to deed the same to the county, and his deed thereto thereafter made with the covenant that he would warrant and forever defend title thereto to the county and its successors "against every person whomsoever lawfully claiming, or to claim the same, or any part thereof."

In his supplemental petition filed in reply to defendant's answer, Charbonneau did not seek a recovery of rent on the remainder of the lease not so taken, on the basis of a pro rata adjustment of the amount after such taking, nor for any recovery on a plea of quantum meruit for the value of the rental on the remaining portion of the lease, nor any plea of waiver growing out of Ellison's continued use of the remaining portion of the lease after he was evicted from the 18-foot strip.

Both in his original brief and in his motion for rehearing, the eviction of Ellison by the county from the 18-foot strip in controversy is conceded by Charbonneau. But appellee earnestly insists that this court erred in holding that the eviction was legally chargeable to the plaintiff Charbonneau as a defense to his suit to recover the full contract price of the rental stipulated in his contract with Ellison. It is contended that that was a controverted issue under the facts and that this court erred in failing to remand the case for a determination of it before a jury.

We quote from the following authorities:

"An implied covenant, or an expressed covenant in the usual form for quiet enjoyment, is generally interpreted to secure the lessee against the acts or hindrances of the lessor and persons deriving their right or title through him." 36 C.J. p. 76.

"The wrongful eviction of the tenant by the landlord or one standing in his right constitutes a breach of the covenant for quiet enjoyment." Id. p. 78.

"An eviction from part of the premises is a breach of the covenant." Id. p. 80.

"The tenant's liability to pay rent may be suspended or terminated because of an eviction from the demised premises during the term, either actual or constructive, effected by the landlord directly, or indirectly through his agency." Id. p. 311.

"According to the general rule, an eviction of the tenant from a portion of the demised premises, by the landlord, or by his authority, operates as a suspension of the entire rent until the premises are restored to the tenant, although he remains in possession of the remainder of the premises demised." Id. p. 315.

"Partial eviction from the premises demised by act of the lessor will relieve the tenant from liability to pay rent upon any portion of the premises during the continuance of the eviction." Citing authorities. 17 L.R.A. 275.

"The landlord cannot 'so apportion his wrong as to enforce the lessee to pay anything for the residue.'" 17 L.R.A. 276.

The following decisions are in accord with those announcements: Edmison v. Lowry, 3 S.D. 77, 52 N.W. 583, 17 L.R.A. 275, 44 Am.St.Rep. 774; Smith v. McEnany, 170 Mass. 26, 48 N.E. 781, 64 Am.St. Rep. 272; Morris v. Kettle, 57 N.J.Law, 218, 30 A. 879, by the Supreme Court of New Jersey.

In Sherman v. Williams, 113 Mass. 481, 18 Am.Rep. 522, it was held that the erection by a third party of a party wall under the eaves of a leased building, with the

consent of the landlord, injuring said building, was a breach of the covenant for quiet enjoyment.

Collins v. Lewis, 53 Minn. 78, 54 N.W. 1056, 1057, 19 L.R.A. 822, was a suit for rent by a landlord. The defendant, the renter, pleaded in defense an eviction from the leased premises by reason of a written agreement of the landlord with Mannheimer, the owner of an adjoining lot, by the terms of which Mannheimer was given the right to excavate upon the east line of the lot held by the tenant to the width of 8 feet, and to the depth of 14 feet, the wall to be so erected by Mannheimer was to become a party wall. It was also agreed between the two property owners that in putting in the foundation for his building, Mannheimer should not injure or interfere with any building or structure then on the leased lot, nor with the use of the surface of the lot by the tenant, and that Mannheimer should provide secure and substantial support for the building on the leased lot, including the one occupied by the defendant, so that the same should not be injured or damaged by the construction work, and further, that in case of any injury or damage, the same should be paid for by Mannheimer. The trial court overruled defendant's plea of eviction. On appeal counsel for the landlord contended that the trespass was that of Mannheimer and his agent and not that of the landlord; that it was not the purpose or effect of the agreement of the adjoining owners to authorize Mannheimer to commit any unlawful act, particularly because the tenant's right of possession was expressly recognized in the agreement. In disposing of the appeal, the Supreme Court of Minnesota had this to say:

"By the execution and delivery of the agreement, Mr. Mannheimer was authorized and empowered by the owner of the fee to enter upon and remove a portion of a lot which the latter had previously leased to the defendant for a term of years, and of which defendant, as tenant, held peaceable possession. * * * According to the answer the removal of the soil from about one sixth of the surface of the premises seriously damaged each of these buildings, rendering them unsafe and insecure, and resulted in other damage to the tenant. This result the landlord had so far anticipated as to undertake to protect himself by providing in the agreement for his own indemnity from pecuniary loss should his tenant be injured. It is difficult to understand how the landlord can authorize the performance of the acts provided for in the agreement without fully realizing that a trespass was to be committed, and his tenant's right to quietly enjoy the premises invaded, unless his consent to the excavation was first obtained. In fact this invasion was expressly sanctioned, aided, and abetted by the agreement, and without its execution it is safe to say would not have occurred. Taking the agreement in connection with the positive assertion found in the answer, that the acts of Mannheimer and his agents were committed under plaintiff's direction, it is obvious that under a claim of title the landlord has interfered with the tenant's possession of demised premises, and has prevented him from having the use and enjoyment of a part thereof. This amounted to a breach of the covenant for quiet enjoyment, and when such a condition exists, and an action is brought to recover for rent subsequently falling due, the tenant may counterclaim and recover his damages. * * *

"The landlord cannot be permitted to excuse and avoid the consequences, the almost inevitable result of his own acts, by showing that the party with whom he has contracted, and has authorized to perform the acts complained of, has agreed to perform so that no injury could result."

The case of Weinman v. De Palma, 232 U.S. 571, 34 S.Ct. 370, 371, 58 L.Ed. 733, was a suit by a tenant against a landlord for damages for breach of his covenant for quiet enjoyment of certain leased premises. The facts show that Weinman leased to De Palma a house and lot for a period of two years and De Palma occupied the property as a retail druggist. During the leased term, Weinman, the landlord, entered into an agreement with one Barnett, the owner of the adjoining lot, giving to Barnett lease to construct a party wall, with permission to take down any part of the east wall of the leased building for that purpose. Barnett employed a general contractor to do the work and while taking down a part of the wall on the leased building, the same fell. De Palma then removed to another location and instituted suit to recover of the landlord damages he suffered as the result of the work so done. The case finally reached the United States Supreme Court from the Supreme Court of New Mexico, and we quote the following from the opinion: "We agree with the supreme court of New Mexico that where the owner of demised premises makes a con-

tract with an adjoining owner for the construction of a party wall, which contract cannot be carried out according to its terms without entry upon the demised premises and an undermining of the tenant's wall, and the adjoining owner or his servants, in the performance of the contract, do commit such a trespass upon the tenant's possession and undermine the wall, the contract is evidential of a command or approval of the trespass by the landlord, such as to render him liable severally, or jointly with the adjoining owner, in an action by the tenant for the resulting· damages."

The case of Kuschinsky v. Flanigan, 170 Mich. 245, 136 N.W. 362, 363, 41 L.R.A. (N.S.) 430, Ann.Cas.1914A, 1228, was a suit by a landlord for rent, which was resisted by 'the tenant on the ground that as a result of work done by the landlord in remodeling his adjoining property, the tenant's back yard was filled with material and rubbish, by reason of which the tenant had been deprived of the beneficial use and enjoyment of that portion of the premises. We quote the following from that opinion:

"The rule of law applicable to an action to recover rent, where partial eviction has taken place, is stated as follows: 'The rule established by the great weight of authority is that an eviction of the tenant by the landlord from a part only of the demised premises works a suspension of the entire rent, though the tenant remains in possession of the balance of the premises demised. The rent in such a case will not be apportioned with regard to the value of the portion from which the tenant was evicted; nor can the landlord recover for the use and occupation of the portion of which the tenant retains possession.' [Citing authorities.]

"The rule is tersely stated in Royce v. Guggenheim, 106 Mass. 201, 8 Am.Rep. 322, by Mr. Justice Gray, where a similar case was considered: 'The eviction of a tenant from the demised premises, either by the landlord or by title paramount, is a bar to any demand for rent, because it deprives him of the whole consideration for which rent was to be paid. [Citing cases.] And his eviction by the landlord from part of the premises suspends the entire rent, because the landlord 'shall not so apportion his own wrong as to enforce the lessee to pay anything for the residue.' " Citing authorities.

In the case of Thomas Cusack Co. v. Pratt, 78 Colo. 28, 239 P. 22, 24, 44 A.L.R. 55, it appeared that a landlord executed a

lease which gave the tenant a right to erect a large advertising sign on the roof of his garage. Later, the owner of the property erected a filling station on another part of the lot, so located as to partially obstruct the view of the sign. The tenant then took down the sign and refused to pay further rent. The landlord then· brought suit to recover the rent, which resulted in a judgment in his favor, but the Supreme Court of Colorado reversed that judgment, saying:

"The general doctrine in such cases is that an actual or physical expulsion of the tenant is not necessary to constitute a breach of covenant for quiet enjoyment. Eviction may be actual or constructive, and any act of the lessor by which his tenant is deprived of the enjoyment of the whole or a material or substantial part of the demised premises, or which shows an intent on the lessor's part permanently to deprive or seriously to obstruct or interfere with the tenant's quiet or peaceful enjoyment, amounts in law to an eviction. [Citing authority.]

"In Graham v. Anderson, 3 Har. (Del.) 364, the court said that eviction of a part would be an eviction of the whole premises. As applied to the case in hand, a substantial partial obstruction of the view would be a violation of the implied covenant of this lease. * * *

"We repeat that the tenant had the right to the continuance of the same conditions, so far as the view is concerned, and so far as concerns defendant's subsequent use of the premises, that existed at the time the lease was made. The lessor plaintiff cannot, by·building upon the same lots a filling station, obstruct the view and collect the rent at the same time. The defendant was justified in treating the acts of the plaintiff as an eviction and in vacating the premises and in refusing to pay the rent."

The facts chiefly relied upon and stressed by appellee in support of his contention that the eviction of Ellison from the 18-foot strip was not chargeable to Charbonneau, are the following: The oral information given by Charbonneau ·to Stevens at the time he executed the right of way deed to the county that Ellison held a lease on the 18-foot strip; the fact that Ellison 'was then in adverse possession of that strip under a duly recorded lease, and the further fact that Charbonneau did not participate with the . county in actually tearing down Ellison's fence.

However, we believe that the other uncontroverted facts recited above and in our original opinion and not necessary to be repeated, show conclusively that the eviction was authorized, sanctioned, and intended by Charbonneau, and therefore he is legally chargeable with its consequences as a matter of law; and those facts being undisputed, the issue could not properly be submitted to a jury.

Motion for rehearing is overruled.