[S. F. No. 17809.   In Bank.   Feb. 3, 1950.]

ALBERT LINDENBERG, Appellant, v. GRAEME
MacDONALD et al., Respondents.

Millard Smith, George Olshausen and Philander Brooks
Beadle for Appellant.

Hoge, Pelton & Gunther and Leo V. Killion for Respondents.

SCHAUER, J.—Plaintiff appeals from an adverse judg-
ment entered upon a directed verdict in his action for dam-
ages (presumably for claimed constructive eviction) allegedly
caused by defendants' attempt, asserted by plaintiff to have
been made in bad faith and unlawfully, to terminate a sub-
lease (sometimes referred to as a lease) of real property.
We have concluded that the trial court correctly determined

that there was no evidence legally sufficient to show bad faith, constructive eviction, or any unlawful act by defendants, and that the judgment must be affirmed.

Defendants are husband and wife and are sued individually and as partners doing business under the name of MacDonald Products Company. In 1942, they subleased to plaintiff for a three-year term ending December 31, 1945, certain store space "having a frontage of approximately 17 feet by a depth of approximately 29 feet" in a building located in Vallejo. Plaintiff opened a retail flower shop and "novelty jewelry" store in the leased premises. The sublease contained the following provision: "Lessor may terminate this lease in the event that the existing improvements are to be torn down to make way for the erection of a new building on sixty (60) days written notice addressed to the lessee . . . It is understood that this is a sublease and subject to all of the terms and conditions in that certain . . . lease made the 26th day of September, 1941 by and between George Edward McGill and Mabel McGill, as lessors and Graeme MacDonald, as lessee, as well as that certain addenda dated the 14th day of October, 1941 . . ."

In October, 1944, defendants, in contemplation of performance by them of an obligation imposed, and under rights conferred, by the McGill lease, negotiated with the J. C. Penney Company for a long term sublease of a new building to be erected by defendants after the building containing the space leased by plaintiff had been torn down, and on November 30, they served upon plaintiff the following notice: "Arrangements have been made to tear down the building which you now occupy and a new building will be erected thereon as soon as you and the other tenants have moved. All tenants have been notified.

"Therefore, I am now giving notice as required by the lease, for you to vacate the premises at 407 Georgia Street not later than January 31, 1945. I regret that you have to move at the present time, as I know the difficulties of finding a suitable location under the present conditions, but in order for me to make certain arrangements which I must do in Vallejo, I must erect this new building now." Other tenants in the same building, all but one of whom also held under subleases, were given the same notice.

Defendant husband knew, at the time the above notice was given, that the new building could not then be con-

structed without a permit from the War Production Board; he fully intended to build but not without the permit. Although the permit had not yet been issued, the defendants' property manager, Mrs. Apgar, who had been negotiating with the board, "felt sure" from those negotiations and from previous experience in securing similar permits that it would be issued, as did defendant husband; they knew, however, that the board had made no binding commitment. As previously indicated, defendants did not own the lot on which the store occupied by plaintiff was situated, but in 1941 had leased it from George Edward McGill and Mabel McGill "over a long period of years" with an agreement to pay a monthly rent to the owners, "to pay the taxes for a period of 45 years," and "tear those shacks down off that lot" and construct a new building which was to serve as security for the long-term lease. The new building had not been erected prior to the fall of 1944 because of priorities difficulties and lack of a definite tenant, and defendants had secured from the McGills two extensions of time to comply with their agreement to build. Plaintiff was aware of the obligation of defendants to demolish the old building and to construct a new one, as it was expressly provided in plaintiff's sublease, as above noted, that "this is a sublease and subject to all of the terms and conditions in that certain indenture of lease made [in] . . . 1941 by and between [the McGills] . . . , as lessors and [defendant husband] . . . , as lessee."

Mrs. Apgar and defendant husband testified that within a few days of the giving of the notice to plaintiff (whether before or after is uncertain from the record), defendants employed an architect to prepare plans for the new building, which was to cost approximately $45,000 and was to follow suggestions made to Mrs Apgar by the War Production Board as to the "type of plan" and of building materials which should be used, and obligated themselves for the architect's fees of some $2,250; the plans were necessary before formal application for the permit could be made. They also ordered an iron truss, to cost $450; incurred an obligation of $500 to a wrecking contractor for services performed and material purchased by him preliminary to actually wrecking the existing building; and "made arrangement" with a contractor and subcontractor for construction of the new building. Defendants also procured from Army and Navy officials and

the Mayor of Vallejo, and filed with the War Production Board, written statements concerning the necessity for the new building.

During December, 1944, because of serious setbacks to United States and allied forces in the Battle of the Bulge in Europe, governmental building restrictions were made more stringent and defendants were informed by the board that issuance of the permit was uncertain. During the latter part of December, 1944, or the first week in January, 1945, Mrs. Apgar informed plaintiff and other tenants of this situation and offered to allow them to stay on a "short termination" basis—in plaintiff's case, on a basis of one or two weeks' notice—at the same rent they had been paying; plaintiff declined, and vacated the premises on January 13, 1945. Mrs. Apgar testified that plaintiff and his wife stated they wished to take a vacation unless they could remain in the store for "the whole year." After plaintiff vacated, the space he had occupied was rented to one of his former employes, to whom plaintiff then sold fixtures and a portion of his stock; the new tenant also operated a jewelry store in the space and paid the same rent formerly paid by plaintiff. All except one of the other tenants in the building remained until the building was actually wrecked some seven months later; the tenant (other than plaintiff) who vacated had already acquired another location and defendants turned over to the Red Cross, rent free, the space he had occupied. Thus, the immediate net result of the giving of the termination notices was a loss of rental income to defendants.

Meanwhile, on January 4, 1945, defendants filed with the War Production Board a formal application for the permit to build; it was refused on January 23. Defendants, however, did not abandon their project nor is there any suggestion that they were released by their lessors from the obligation to build. They continued their efforts to complete the project and, after two more permit applications had first been presented and denied, war developments became more favorable and they were able in August of 1945, to complete the razing of the old building and actually commence construction of the new one.

Concerning the reason for giving the termination notice to plaintiff prior to the formal granting of a permit by the board, defendant testified that waiting for issuance of the

permit would have meant a two months' delay in construction of the new building, and the loss of the difference in rent between that paid by tenants of the old building and that to be paid by the J. C. Penney Company for the new structure was "a small consideration . . . I wanted to build the building. I had a contract with the owner of the lot to build a building. Everybody wanted me to build the building." Certainly we should recognize that defendants were under obligations to keep good faith with their lessors as well as with their subtenants. The situation insofar as good faith is concerned would not have been materially different if the War Production Board had previously granted a permit and, upon adverse war developments, had cancelled it.

The trial court was of the view that plaintiff could recover only if he established bad faith by defendants in the giving of the notice, and that no evidence had been produced tending to show such bad faith. Accordingly, defendants' motion for a directed verdict was granted (see *Estate of Flood* (1933), 217 Cal. 763, 768 [21 P.2d 579]; *Burgess* v. *Cahill* (1945), 26 Cal.2d 320, 321-322 [158 P.2d 393, 159 A.L.R. 1304]) and this appeal followed.

Both parties agree that inasmuch as no evidence was introduced to show the meaning of the termination provisions of the lease, the construction thereof is a question of law for the court and that no issue of fact is presented. Plaintiff contends, however, that because at the time the notice was given defendants admittedly did not have the permit and did not intend to build without it, the notice was premature as a matter of law and, necessarily, that although it would have been wholly ineffective as a basis for an unlawful detainer action and could have been disregarded by plaintiff, it entitled plaintiff to vacate the premises and claim damages. Although no California decision on this precise point has been discovered, plaintiff relies upon *Woods* v. *Postal Telegraph-Cable Co.* (1920), 205 Ala. 236 [87 So. 681, 27 A.L.R. 834]; *Clise Inv. Co.* v. *Stone* (1932), 168 Wash. 617 [13 P.2d 9]; and *Donohue* v. *City of New York* (1907), 54 Misc. 415 [105 N.Y.S. 1069]. It may be noted, however, that none of these cases was an action for damages after surrender of possession with knowledge of all pertinent facts; on the contrary, Woods and Clise were actions seeking to dispossess tenants and *Donohue* v. *City of New York* was an injunction suit brought by plaintiff to restrain interference with his

possession of leased premises. In each of such cases the court determined that the contingency permitting termination of the involved lease had not arisen.

■■ We are of the view that regardless of whether the notice received by plaintiff here, prior to actual issuance of the permit, would have supported a possible unlawful detainer action by defendants, the trial court correctly determined, in the light of all the circumstances shown, that in order for plaintiff to recover damages for constructive unlawful eviction, or on any conceivable appropriate theory, it was incumbent upon him to establish bad faith by defendants and that no evidence was introduced which on any tenable view could support a finding of bad faith. (See *Donohue* v. *City of New York* (1907), *supra*, 54 Misc. 415 [105 N.Y.S. 1069, 1070]; *Woods* v. *Postal Telegraph-Cable Co.* (1920), *supra*, 205 Ala. 236 [87 So. 681, 27 A.L.R. 834]; *Southeastern Land Co.* v. *Clem* (1931), 239 Ky. 417 [39 S.W.2d 674, 676].) Especially is this true where, as here, plaintiff was fully informed of all the facts prior to the date he vacated and was offered an opportunity to remain. The following language from *Gibson* v. *Thisius* (1943), 16 Wn.2d 693 [134 P.2d 713, 714], is particularly in point here: "It has been broadly stated in some cases that mere notice to quit, followed by vacation of the premises by the tenant, is sufficient to constitute a constructive eviction—or, at least, to make an issue of fact for the jury. We think, however, there will be found in all such cases harassing incidents disturbing to the tenant's peaceful possession occurring on the property. That is the situation presented in *Hobson* v. *Union Oil Co.*, 187 Wash. 1, 59 P.2d 929, where we held that the question as to whether there was an eviction or a voluntary surrender by the tenant was one of fact for the jury. That decision does not impair the force of former decisions of this court adhering to the rule that, to constitute a constructive eviction, some substantial interference by the landlord which is injurious to the tenant's beneficial use and enjoyment of the premises must occur. *Ralph* v. *Lomer*, 3 Wash. 401, 28 P. 760; *Wusthoff* v. *Schwartz*, 32 Wn. 337, 73 P. 407; *Tennes* v. *American Building Co.*, 72 Wn. 644, 131 P. 201; *Cline* v. *Altose*, 158 Wash. 119, 290 P. 809, 70 A.L.R. 1471.

"A threat made in good faith to resort to legal process does not constitute duress. *Zent* v. *Lewis*, 90 Wash. 651, 156 P. 848; *Ingebrigt* v. *Seattle Taxicab & Transfer Co.*, 78 Wash.

433, 139 P. 188; *Investment & Securities Co.* v. *Adams*, 192 Wash. 41, 72 P.2d 288. By the same token, it cannot amount to a constructive eviction. Whether or not the threat is made in good faith may or may not be a question of fact for the jury to decide. That depends upon the state of the evidence. In this record there. is not a scintilla of evidence from which it can be inferred that plaintiff acted in bad faith in threatening defendants with a suit for treble damages. On the contrary, the evidence is conclusive that he acted not only in good faith but also with probable cause."

In further support of our view on this matter is an opinion rendered on June 16, 1949, by the Appellate Department of the Superior Court in Los Angeles, in the case of *Nyulassie* v. *Mozer* (Civ. A No. 7057), in which plaintiff sought damages by reason of a notice to quit which allegedly contained representations of fact known by defendant to be false, acted upon by plaintiff to his damage. The assertedly false statement was that defendant wanted the premises for immediate occupancy by his son and daughter-in-law. Defendant had no daughter-in-law at the time the notice was given, but expected his son to marry approximately two months later. These facts were fully known to plaintiff, who vacated and then sued for damages. The court, in reversing a judgment for plaintiff, stated, ''The evidence is insufficient to support the conclusion that defendant's purpose, when he served the notice on the plaintiff, was other than that represented, that is, so that his son and daughter-in-law-to-be would occupy the premises. 'The cases are legion to the effect that fraud will not be presumed and that proof thereof must be clear, convincing and unequivocal.' [Citation.] ''

It clearly appears that at all times concerned defendants here acted with a bona fide intention to fulfil their contract with the landowner, with which contract plaintiff was acquainted, by razing the existing building and replacing it with a new structure, that they earnestly and diligently proceeded with the contemplated project and that they completed it as soon as was reasonably possible under the circumstances shown. That project was at no time inherently unlawful; on the contrary, it was but an exercise of a right which is an incident of the ownership of property, the freedom of which is basically protected by the Constitution. Primarily, but subject to general laws within the constitutional scope, that right is limited only by the private contract of the owner. Under war conditions its exercise was temporarily subject

to additional regulations, but it should not be regarded as having been at any time completely nonexistent. On the contrary, it was one of the rights which this country was fighting to preserve.

Certainly there was unforeseen delay (approximately seven months) in attaining completion of the project, but that delay was due solely to causes beyond the control of defendants. It was through no fault of theirs that the United States and its allies suffered a temporary serious reversal in the Battle of the Bulge and that, as a result thereof, the War Production Board receded from the practice which it had been following, withdrew its theretofore suggested tentative approval of the project and denied, temporarily, issuance of the formal permits which the law and regulation transiently required as a condition to defendants' procurement of materials for the construction of the new building. As already pointed out, defendants persisted in their efforts to secure the required permits, at no time abandoned their declared and perfectly lawful intention of living up to their contract to erect the new building, and actually did begin work on such building promptly when the controls were eased and such work was permissible. The purpose of the notice fitted the obligation of the sublessors and the language of the sublease: the existing improvements were in truth "to be torn down to *make way* for the erection of a new building." (Italics added.)

It further is undisputed that defendants promptly and frankly disclosed to plaintiff the fact that because of the course which the war was taking the date of securing of the permit had become uncertain, and they offered to permit plaintiff to remain in possession on a short-term basis until it could be more definitely ascertained when erection of the building would be allowed. The representative of defendants told plaintiff "that we were not at all sure of getting this permit and I wanted them to know just as soon as possible so they could continue to stay in business until we knew what the answer was going to be." Nevertheless, plaintiff moved out of the premises while defendants were still attempting to secure the formal permit to proceed but before it had definitely been learned whether the work could then proceed or would have to be deferred pending war developments.

By the exigencies of war and wartime regulations the defendants appear to have been caught between the millstones

of their obligations to their lessors on the one hand and to their subtenants on the other. Courts should not lightly permit such exigencies to be seized upon as a basis for assessing damages against those who in entire good faith gave a termination notice to a subtenant, which notice the givers believed they had a right to give, in an effort to perform an obligation to which they were bound, and where, upon learning that uncertainty existed as to their securing the governmental permit at the time first fixed, they immediately advised their subtenant of the fact and offered to allow the subtenant to remain pending the uncertainty. From its inception the plaintiff's sublease was potentially subject to termination on various contingencies; he was aware of the obligations and rights of defendants under the McGill lease; he knew, as well as defendants, the extent of and limitations on the right of defendants to terminate his sublease. And likewise he knew, as well as did defendants, the circumstances upon which the right of defendants to give the termination notice depended. Plaintiff urges that the notice was premature as a matter of law. If in truth it was premature then it was legally ineffective and plaintiff could have remained in possession of the premises until a proper and timely notice to vacate was given. The facts were not concealed from him. We are satisfied that under these circumstances the mere giving of the notice did not constitute a constructive eviction and that by voluntarily departing from the premises, having full knowledge of all the facts which he now claims rendered the notice premature, he precluded the raising of any such question as would have arisen if he had chosen to remain in possession and resist a possible unlawful detainer action.

The judgment of the trial court is affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

EDMONDS, J.—I cannot agree with the conclusion that ". . . there was no evidence legally sufficient to show bad faith, constructive eviction, or any unlawful act by defendants." This is tantamount to a holding that whenever a lessor believes that he is, or soon will be, acting legally, he may not be guilty of an actual or constructive eviction. On the contrary, in my opinion, the evidence in this case compels the conclusion, as a matter of law, that the MacDonalds evicted Lindenberg and are liable for any damages sustained by him.

The terms of the lease under which the property was rented are determinative of the rights of the parties. If, under the lease, the notice to vacate was premature and, therefore, without effect, the subsequent lease to Penney during the unexpired term of Lindenberg's lease constituted an actual eviction of the prior lessee. Moreover, if under the circumstances shown by the record, the terms of the lease did not allow a termination of the tenancy, the notice served upon Lindenberg constituted a constructive eviction of him. That notice was given in conjunction with the harassing threat of imminent destruction of the existing building and was followed by insistence that Lindenberg remain, if at all, upon a tenuous month-to-month basis.

The lease to Lindenberg included the following provision: "Lessor may terminate this lease in the event that the existing improvements are to be torn down to make way for the erection of a new building on sixty (60) days written notice addressed to the lessee. . . ." In the latter part of 1944, following negotiations with J. C. Penney Company for a long term lease of a building to be constructed for them replacing the one occupied in part by Lindenberg, MacDonald served the following notice on his lessee: "Arrangements have been made to tear down the building which you now occupy and a new building will be erected thereon as soon as you and other tenants have moved. All tenants have been notified. Therefore I am now giving notice as required by the lease, for you to vacate the premises at 407 Georgia Street not later than January 31, 1945. I regret that you have to move at the present time, as I know the difficulties of finding a suitable location under the present conditions, but in order for me to make certain arrangements which I must do in Vallejo, I must erect this new building now. . . ."

The MacDonalds' formal application to the War Production Board for the necessary building permit was filed on January 4th. On January 13th, after Lindenberg was given an opportunity to remain on a month-to-month basis, he vacated the premises. Ten days later, the application for a building permit was denied. During the following April and June, the board made the same ruling on subsequent applications. In August, the permit was obtained and the construction of a new building was commenced. The Lindenberg lease then had an additional four months to run.

The interpretation of any written instrument derived solely from the language of the writing itself, unaided by

extrinsic evidence of the intent of the parties or the surrounding circumstances, is always a question of law, not of fact. (*Estate of Janes*, 18 Cal.2d 512, 515 [116 P.2d 438]; 9 Wigmore on Evidence [3d Ed.], § 2556, p. 522; 6 Cal.Jur. [Contracts, § 193] 328.) In the present case, there being no such evidence, the question of the lessors' liability turns upon the meaning, as a matter of law, of the phrase in the lease allowing it to be terminated where existing buildings "are to be torn down." Upon oral argument, counsel for both parties agreed that the construction of the lease presents an issue of law which governs the rights of the parties.

The MacDonalds argue that the language "existing improvements *are to be* torn down to make way for erection of a new building" requires nothing but a good faith intention or hope on the part of the landlord. The position of Lindenberg is that, although good faith is an implied condition of every contract, "intention without ability to perform does not mean anything." There is considerable evidence that the MacDonalds gave the notice in a good faith belief that they would be able to rebuild, but the testimony is unconflicting that they did not have, nor believe that they had a present ability to carry out such intention at the time they directed Lindenberg to vacate.

There are certain rules which must be considered in interpreting the lease provision. "A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." (Civ. Code, § 1442.) Also, uncertainties in an agreement are to be interpreted most strongly against the one who prepared it. (Civ Code, § 1654; *Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410, 422 [139 P.2d 892].) To hold, as the trial court did, that a good faith desire to build is the *only* requirement for termination, is to construe the lease most favorably to the lessor and to take from the lessee any unqualified right to occupy the premises for a term longer than 60 days, the period specified for giving notice of termination. A far more reasonable construction of the contract is that the language authorizing a termination of the lease if and when the existing improvements were to be replaced by a new structure required as a basis for termination of the lease an unconditional and present right to build. The notice given by the MacDonalds follows this construction of the terms of the lease, for it stated: "Arrangements *have been made* to tear down the building . . . and a new building will *be erected thereon as soon as you and other tenants*

*have moved.''* By this notice Lindenberg was led to believe that the MacDonalds had a present ability, as required by his contract with them, to build the new structure. Yet the uncontradicted evidence is that no such ability existed at the time the notice was given.

The MacDonalds admittedly knew that they could not legally erect a building without a permit from the War Production Board. They also were aware that the issuance of such a permit was within the discretion of the board. The owners had no certainty that such a permit could be obtained; indeed, their knowledge of the lack of binding effect upon the board of any tentative opinion of its local officers is conclusively shown by the record. Other evidence, clear and uncontradicted, is that the action of the MacDonalds in connection with the demolition of the existing building and the erection of a new one was with knowledge of the board's requirement for the submission of construction plans before any formal approval would be given. The owners make no claim that they acted without full knowledge either of the facts or the law, or with any intention to build without a permit.

The record, therefore, clearly shows that the unconditional notice to vacate was based upon a conditional right to build. The lease did not allow a termination of the tenancy in the event existing improvements "possibly may be razed" or "probably will be replaced.'' The contract of the parties, without any qualification whatever, was that the tenancy might be terminated when the buildings ". . . are to be torn down. . . .''

Implicit in any determination of present ability to build is that there be no controlling discretion in third parties. (*Woods* v. *Postal Telegraph-Cable Co.*, 205 Ala. 236 [87 So. 681, 27 A.L.R. 834].) The permit from the War Production Board was a condition precedent to a lawful right to build, and until it was obtained the lessors had nothing but a hope that soon they might begin construction. In no sense did they have the present unconditional ability to commence the construction of the improvement mentioned in the notice of termination. Moreover, the lessors did not have the right, nor by their own admission did they have the intention, to evict Lindenberg, raze the then existing structure and leave the land vacant until such time as they could put a new building upon the property. (*Donohue* v. *City of New York,* 54 Misc. 415 [105 N.Y.S. 1069]; *Southeastern Land Co.* v.

*Clem,* 239 Ky. 417 [39 S.W.2d 674].) Under these circumstances, as a matter of law, the notice was ineffectual to terminate the lease.

A tenant is evicted where, before the expiration of his lease, the landlord rents the demised premises to another person, who takes possession of them without the tenant's consent. (*Conerstone Building & Loan Assn. of Newark* v. *Tallman,* 14 N.J. Misc. 375 [185 A. 361]; *Ellison* v. *Charbonneau,* (Tex.Civ.App.) 101 S.W.2d 310.) This is true although the tenant previously has vacated the premises (*Higgins* v. *Street,* 19 Okla. 45 [92 P. 153, 14 Ann.Cas. 1086, 13 L.R.A.N.S. 398].) In this case the MacDonaids leased the premises and commenced to tear down the building in which Lindenberg's store was located four months before the expiration of his lease. There is no conflict in the evidence concerning his desire to remain in possession for the remainder of the term of his lease rather than to occupy the store on a month-to-month basis subject to the Penney lease. He vacated only because of the compulsion of his lessors, and his eviction was not cured by the landlords' offer to allow him to remain on a short-term basis.

Further, the record warrants the conclusion that Lindenberg was constructively evicted. "Any disturbance of a tenant's possession by a landlord or by someone acting under his authority, whereby . . . the tenant is deprived of the beneficial enjoyment of the premises, amounts to a constructive eviction." (*Giraud* v. *Milovich,* 29 Cal.App.2d 543, 547 [85 P.2d 182]; *Riechhold* v. *Sommarstrom Inv. Co.,* 83 Cal. App. 173 [256 P. 592].) ". . . [I]t is not necessary that there should be an actual ouster to constitute an eviction, but . . . any act of the lessor which results in depriving his lessees of the beneficial enjoyment of the premises constitutes an eviction." (*Agar* v. *Winslow,* 123 Cal. 587, 593 [56 P. 422, 69 Am.St.Rep. 84].)

A lessor's unjustified written notice to a lessee to vacate may, alone, constitute constructive eviction. ". . . [T]he law is that such notice, . . . is constructive eviction; that it is not necessary for the tenant to wait until ejectment proceedings are instituted." (*American Jewelry Co.* v. *Barrs Self-Driver Co., Inc.,* 48 Ohio App. 239 [192 N.E. 865, 866]; see, also, 52 C.J.S. Landlord and Tenant, § 458, p. 179.) And when the lessor has evidenced the requisite intent to evict and thereby deprive the lessee of his beneficial enjoyment

of the demised premises, the lessee is entitled to abandon the property and consider himself constructively evicted.

In the present case, the unauthorized notice to vacate was coupled with the statement that the existing buildings were to be razed immediately. The lessor had negotiated and entered into another lease, and Lindenberg was told that he might remain, if at all, only under a month-to-month lease. These factors constituted interference with his beneficial enjoyment under his three-year lease, and show, as a matter of law, that he was constructively evicted. Accordingly, he has a cause of action for the resulting damages. (*Beckett* v. *City of Paris Dry Goods Co.,* 14 Cal.2d 633 [96 P.2d 122]; *Cappuccio* v. *Tufts,* 109 Cal.App. 274 [293 P. 91]; *Saferian* v. *Baer,* 105 Cal.App. 238 [287 P. 142].)

I would, therefore, reverse the judgment and remand the cause for a new trial upon the issue of damages.

Traynor, J., concurred

CARTER, J.—I dissent.

I find myself in the middle of two extreme positions as I cannot agree with the opinion of either Justice Schauer or Justice Edmonds.

We have a case here in which a landlord, under a provision in a lease, may terminate a lease on 60 days' notice if the building presently on the property covered thereby is to be removed and a new one erected. Pursuant to that option the lessor gives to the tenant an *unequivocal* notice that the lease is terminated and the lessee must vacate. Acting in response to that notice, not of his own volition, the tenant vacates the property. He then brings an action for damages for eviction (or for a breach of the covenant of quiet enjoyment), asserting that the landlord had no right to terminate the lease because when the notice was given, governmental restrictions made it unlawful to construct buildings without obtaining permission from the War Production Board and such permission had not been obtained. Now that issue, namely, did the termination clause justify a termination of the lease under the conditions present (hereafter referred to as termination issue), is the *only* issue *ever* presented in the case until Justice Schauer injects a new question, that is, did such termination constitute an eviction. It was alleged by the plaintiff-tenant and *not denied* by the defendant-landlord, "That on or about November 28, 1944, defendants, by instru-

ment in writing, *terminated* said lease and *ordered plaintiff to vacate said* premises as of January 31, 1945." [Emphasis added.] The parties never doubted that a termination of the lease was accomplished by the notice and that, as such, *it constituted an eviction of the tenant.* The sole question was the termination issue. The issue was so stated to the jury in the lessor's opening statement, and in his motion for a directed verdict (which was granted and is here involved), lessor's counsel said: "And the other case is *Southeastern Land Co.* v. *Clem,* 239 Ky. 417 [39 S.W.2d 674], where the Court said that where a lease is terminable only on certain conditions, the lessor cannot terminate the lease except in pursuance of a bona fide intent to carry out the improvements on the property referred to.

"And that is *exactly all we are concerned with here.* There is no reason why we should be compelled to have a jury pass on this thing, in view of the evidence here, because the situation is such that reasonable men could not differ on the conclusion to be reached. Can any reasonable person then say these people did not have a bona fide intent of wrecking that building and going ahead with the improvements within a reasonable time after that notice took effect?" [Emphasis added.] The motion for a directed verdict was granted. Thus the trial court did not at any time pass upon the eviction question.

As I understand Justice Schauer's opinion, he *does not decide* the termination issue. He tacitly assumes that the notice of termination and to vacate was *not* proper under the lease and existing circumstances. He then holds that *a notice to vacate, if given by the lessor with a good faith, though erroneous, belief that he was entitled to give it, followed by a vacation of the premises by the tenant, does not constitute an eviction.*

In the first place, it should be clear that giving a wrongful but unequivocal notice of termination of the lease and to vacate, which amounts to a demand for possession, followed by a vacation of the premises by the tenant as a result thereof, should alone constitute a constructive eviction, and it has been so held. (*Eggers* v. *Paustian,* 190 Iowa 638 [180 N.W. 873]; *American Jewelry Co.* v. *Barrs Self-Driver Co.,* 48 Ohio App. 239 [192 N.E. 865].) Indeed, that should be the law for the lessor has taken the initial step and position that the tenant should get out. The tenant should be entitled to rely upon such action by the landlord, and the latter should run the risk of whether he is right or wrong in his termination

of the tenancy. The tenant should not be required to take the chance and face an unlawful detainer action with its harassment and expense, together with the uncertainty of his tenancy. If the circumstances were reversed and the tenant repudiated the lease, he would assume the risk of the legality of his stand. In contract law, it cannot be doubted that an unequivocal repudiation of the contract by the promisor is not only justification for the promisee's failure to perform thereafter, but gives an immediate cause of action for damages. (*Gold Min. & Water Co.* v. *Swinerton,* 23 Cal.2d 19 [142 P.2d 22].)

Moreover, in the instant case we have more than a mere notice to quit. As heretofore seen, the lessor *admitted* that the lease was *terminated* by the notice and that the tenant must vacate. The lessor was adamant in his talks with the lessee that he must vacate. What more is necessary to constitute an eviction?

If it be assumed that Justice Schauer holds (and it seems to be the case) that, although there may have been an eviction by reason of the notice, yet such does not occur if the lessor believed in good faith that he had a right to terminate the lease. In other words, a lessor may evict a tenant and breach the covenant of quiet enjoyment with immunity from damages if he honestly believes he has legal ground for the eviction, even though he is clearly wrong. With that I cannot agree. In most instances the promisor's or lessor's claim for possession is in good faith, but if he is wrong, he is liable. It is no excuse for a breach of contract that the promisor honestly thought he was justified in breaking it. In any event, however, the question of whether the landlord acted in good faith is one of fact.

In regard to the termination issue, it appears that the generally accepted rule is that the lessor cannot terminate the lease unless he in good faith intends and has a reasonable expectancy of being able to erect a building on the property. "Where a lease is terminable only on certain conditions, the lessor cannot terminate the lease, except in pursuance of a bona fide intent to carry out the purpose referred to." (*Southeastern Land Co.* v. *Clem,* 239 Ky. 417 [39 S.W.2d 674].) (See, also, *Dubois* v. *Gentry,* 182 Tenn. 103 [184 S.W. 2d 369]; *Clise Inv. Co.* v. *Stone,* 168 Wash. 617 [13 P.2d 9]; 163 A.L.R. 1034.) In such a case, in order to justify the termination of the lease, the burden of proof is on the lessor

to show he was entitled to terminate it. The tenant in the eviction action shows the eviction. It is then incumbent on the landlord to show he in good faith intended to build and had an honest and reasonable expectancy that he would. In *Allen* v. *Kilpatrick*, 277 Mass. 237 [178 N.E. 511] the lessor had the option of terminating if the premises were rendered unfit for habitation by fire, and in the eviction action the court said: "The burden of proving justification of termination of the tenacy was on the defendants [landlord]." In the instant case, the case should have been submitted to the jury. It could have disbelieved the lessor's evidence that he "felt" he could get a permit to build and thus the burden would not have been sustained. Taking the evidence outlined by Justice Schauer, it appears that no permit had been obtained prior to the notice of termination; in fact, *it does not appear that an application for a permit had even been made.* Yet the lessor said in his notice that arrangements *had been made*; they had not. It was not until after the notice (at least the lessor did not prove the contrary) that an architect for the new building was employed. These and other factors would justify the jury in inferring that there was no good faith intent to construct the new building or a reasonable probability of accomplishment. It is no answer to say that the landlord wanted to get his notice in early to avoid the 60-day delay. The 60-day period *was for the lessee's benefit.* He was justified in insisting that it not run until good faith arrangements had been made for a new building. The burden was on the landlord to prove that such arrangements had been made. This presented an issue of fact for the jury and the trial court erred in granting defendants' motion for a directed verdict.

I would, therefore, reverse the judgment.

Appellant's petition for a rehearing was denied March 2, 1950. Edmonds, J., Carter, J., and Traynor, J., voted for a rehearing.