[Civ. No. 14200. Third Dist. Nov. 18, 1974.]

RONALD M. GUNTERT et al., Plaintiffs and Respondents, v.
CITY OF STOCKTON, Defendant and Appellant.

## COUNSEL

Monroe Langdon, City Attorney, Paul F. Mordy, Assistant City Attorney, Wilson & Hoslett, John A. Wilson, Pillsbury, Madison & Sutro, Noble K. Gregory and Michael H. Salinsky for Defendant and Appellant.

Brobeck, Phleger & Harrison, Malcolm T. Dungan, Thomas A. Welch and Jeffery S. Kingston for Plaintiffs and Respondents.

## OPINION

**FRIEDMAN, J.**—Plaintiff Ronald M. Guntert and two wholly owned corporations brought this suit against the City of Stockton, seeking declaratory relief, an injunction and damages. After trial the superior court entered findings in favor of plaintiffs, ordered issuance of a permanent injunction and directed a future trial for the purpose of fixing damages. The City of Stockton appeals from the order granting an injunction.[1]

---

[1] The city's notice of appeal also embraced a nonexistent "judgment" as well as the trial court's findings and its order denying a motion for new trial. No appeal lies from findings or from denial of a new trial. To the extent that it embraces other matters than the order granting injunctive relief, the city's appeal is dismissed.

Guntert and his companies operate a steel construction and machinery manufacturing business on waterfront land, known as Banner Island, which Guntert leases from the City of Stockton. Guntert occupies the property under a 1966 lease as amended and extended in August 1970. The amended lease includes a clause permitting termination by the lessor on 18 months' written notice when and if the city decides to accept a development offer conforming to described conditions. The text of the termination clause appears in the margin.[2]

Both before and after the 1970 lease amendment, Stockton city officials had been negotiating with a group of developers called Channel Land Company. In these negotiations the city was represented by the city manager, assistant city manager and by the Marina Committee of the city council. Ultimately Channel Land Company formulated a proposal to develop commercial and marina facilities on the Stockton waterfront, including a 12-story, $9,000,000 hotel on Banner Island, which the developers would lease from the city upon termination of the Guntert lease. Negotiations between city officials and Channel Land Company continued through 1971. In February 1972 the Marina Committee of the city council approved a report of the city manager recommending adoption of Channel Land Company's proposal and termination of the Guntert lease. Over Guntert's objection the city council adopted a resolution accepting the recommendation of the Marina Committee and directing termination of Guntert's lease. The city gave Guntert notice that his lease would be terminated at the end of 18 months. Guntert filed the present lawsuit.

After a trial, the superior court concluded that the city council had acted unreasonably, arbitrarily, without good faith and in breach of the duty created by the Guntert lease to inquire into the bona fides of Channel Land Company's development proposal. The court concluded that the city's attempt to terminate the Guntert lease was a nullity. Accordingly, it granted an injunction against further efforts to dispossess the lessee.

## I

■ We turn initially to a jurisdictional problem. The city's appeal is taken from an order granting a permanent injunction. That order is a

[2]The termination clause reads as follows: "From and after the date of this Agreement, Lessor [City of Stockton] shall have the right to terminate said Lease dated June 1, 1966, upon eighteen (18) months' written notice to Lessee, when the City Council of the Lessor has received and agreed to accept a bona fide offer or proposal to develop the demised premises . . . . The determination as to the validity of said offer or proposal and the economic feasibility and the ability to adequately finance said development shall be at the sole discretion of said City Council."

partial disposition of the lawsuit. Although an order granting an injunction is appealable (Code Civ. Proc., § 904.1, subd. (f)), the appeal may run afoul of the one-final-judgment rule, which frowns on piecemeal appellate adjudication. When the trial is bifurcated and the damage issue remains to be tried, an appeal from the interlocutory disposition is usually premature. (*Clovis Ready Mix Co.* v. *Aetna Freight Lines,* 25 Cal.App.3d 276, 280 [101 Cal.Rptr. 820].) This court has dismissed as premature an appeal from an injunction order where the damage issue was yet untried. (*Engle* v. *City of Oroville,* 238 Cal.App.2d 266, 269 [47 Cal.Rptr. 630]; see also, *McCarty* v. *Macy & Co.,* 153 Cal.App.2d 837 [315 P.2d 383].) Notwithstanding the general rule, we have concluded that appellate jurisdiction exists.

In April 1974, after this appeal had been briefed, plaintiffs requested expedited argument and disposition. They pointed to financial losses suffered by the Guntert enterprises, which were operating under the uncertainties created by an 18-month notice to vacate their premises. The showing of economic hardship prompted us to expedite calendaring. In June 1974 the City of Stockton filed a motion, declaring that the damage phase of the suit had now been tried, that a judgment adverse to the city had been entered in February 1974 and that the city had appealed. Its motion sought consolidation of the two appeals. Counsel for Guntert filed opposition, pointing out that briefing of the second appeal would delay the hearing and disposition of the first appeal, thus intensifying and prolonging the economic hardship suffered by the Guntert enterprises. Exercising our discretion, we denied the city's motion to consolidate.

The parties' desire for appellate review does not, of course, create appellate jurisdiction. When the appeal is from an interlocutory or other nonappealable order, the one-final-judgment rule is statutory, for subdivision (a) of section 904.1, Code of Civil Procedure, prevents an appeal from a judgment which is not final. (6 Witkin, Cal. Procedure (2d ed.) p. 4050.) Here the statute confers appellate jurisdiction, for it recognizes an order granting injunctive relief as an appealable order. (Code Civ. Proc., § 904.1, subd. (f).) Here the one-final-judgment rule is not a statutory prohibition but a product of appellate policy, which deprecates piecemeal appeals in order to conserve appellate energies.

In unusual situations, where inflexible application of the nonstatutory rule would produce inutility or hardship, a few decisions exhibit a willingness to bend the rule or find exceptions. (See *Western Electroplating Co.* v. *Henness,* 172 Cal.App.2d 278, 283-284 [341 P.2d 718]; *Brown* v.

*Memorial Nat. Home Foundation,* 158 Cal.App.2d 448, 456-457 [322 P.2d 600, 72 A.L.R.2d 997]; see also, *California etc. Assn.* v. *Superior Court,* 8 Cal.App. 711, 713 [97 P. 769], cited in *Stockton* v. *Rattner,* 22 Cal.App.3d 965, 969 [99 Cal.Rptr. 787].) Other decisions indulge in procedural devices to escape the rule "in the interests of justice and to prevent unnecessary delay . . . ." (*Gombos* v. *Ashe,* 158 Cal.App.2d 517, 524 [322 P.2d 933]; see 6 Witkin, Cal. Procedure (2d ed.) pp. 4065-4066.)

When appellate jurisdiction depends on a court-made policy rule and not on statute, appellate discretion supplies a firmer conceptual base than procedural fictions. In cumulative effect, the decisions temper the rule to the point of justifying an exception in unusual cases when its enforcement would result in injustice or more waste than saving of the time and energies of court and counsel.

Here the trial resulted in findings which firmly adjudicated the merits of the lawsuit, leaving only the amount of damages for later ascertainment. The present review will determine all issues except the amount of damages. Guntert has demonstrated economic hardship flowing from appellate delay. Judicial policy chooses to avoid this hardship, even at the cost of a second appellate decision. In the exercise of discretion, we withhold application of the nonstatutory one-final-judgment rule.

## II

The lease (fn. 2, *ante*) permitted the city to give notice of termination when the city council was satisfied (to describe the matter in general terms) with a development proposal from a third party. ■ When a contract establishes the satisfaction of one of the parties as a condition precedent, two tests are recognized: (1) The party is bound to make his decision according to the judicially discerned, objective standard of a reasonable person; (2) the party may make a subjective decision regardless of reasonableness, controlled only by the need for good faith. (*Mattei* v. *Hopper,* 51 Cal.2d 119, 122-124 [330 P.2d 625]; *Kadner* v. *Shields,* 20 Cal.App.3d 251, 258 [97 Cal.Rptr. 742].) Which test applies in a given transaction is a matter of actual or judicially inferred intent. (*Kadner* v. *Shields, supra,* 20 Cal.App.3d at p. 262.) Absent an explicit contractual direction or one implied from the subject matter, the law prefers the objective, i.e., reasonable person, test. (*Id.* at p. 263.)

The city charges the trial court with error in imposing the "reasonable person" test. It points to the clause vesting the city council with "sole

discretion" to judge the acceptability of a development proposal, including the developers' financing ability. This clause, it contends, demanded application of the subjective test, limiting it only by the need for good faith. As to the latter, the city charges absence of substantial evidence to support the trial court's finding that good faith was absent.

The termination clause of the lease (fn. 2, *ante*) empowered the city to act when it received a "bona fide offer" to develop the property; invested the city council with "sole discretion" to determine the offer's "validity," its economic feasibility and the developers' ability to finance the project. At this point we summarize significant findings of the trial court: In framing the 1970 lease extension, the parties intended to authorize termination only when the city council reasonably and in good faith decided that a development proposal was valid, economically feasible and submitted by persons who had demonstrated their present financial ability to complete the project; the city manager had an acknowledged belief that Channel Land Company did not have present ability to finance its proposal; Channel Land Company had misrepresented its ability to obtain financing and its proposal was not bona fide; the city manager and city council made no inquiry into the feasibility of Channel Land Company's proposal or its present ability to finance it; Channel Land Company did not demonstrate and did not have present ability to finance its proposal and did not demonstrate the economic feasibility of its hotel project; in determining that Channel Land Company had financing ability, that its proposal was valid and economically feasible, the city council did not exercise good faith.

In its conclusions of law the trial court declared that the city council had acted arbitrarily, did not exercise reasonable discretion, acted without good faith and in conscious disregard of its duty to inquire into the bona fides of Channel Land Company's proposal.

According to the findings, the trial court construed the contract to require a city council decision which was both reasonable and in good faith. Reasonableness and good faith are dissimilar qualities. ■ Reasonableness does not lend itself to formulary definition; in most legal contexts, it is discoverable by reference to the common experiences of mankind as perceived by the factfinder. (See *Seligman* v. *Tucker,* 6 Cal.App.3d 691, 697-699 [86 Cal.Rptr. 187].) In applying this standard to a deliberate choice, a negative formulation is available by equating lack of reasonableness with arbitrariness. Action is arbitrary not only when it is capricious, but when it lacks substantial support in the evidence, when the facts do

not reasonably justify the conclusion. (*Hollon* v. *Pierce,* 257 Cal.App.2d 468, 478 [64 Cal.Rptr. 808].)

■ Good faith, in contrast, suggests a moral quality; its absence is equated with dishonesty, deceit or unfaithfulness to duty. (*People* v. *Nunn,* 46 Cal.2d 460, 468 [296 P.2d 813].) The lack of synonymity between reasonableness and good faith entails a distinction between unreasonableness and bad faith. The two qualities may exist in parallel, but the latter is not the necessary product of the former. In order to guard against a spurious finding of bad faith as a product of unreasonableness, we consider the latter alone as the standard by which validity or invalidity of the Stockton City Council's action depends. ■ In short, did the trial court correctly construe the contract when it applied the objective, reasonable person test to the city council's action?

## III

The termination clause (fn. 2, *ante*) was reasonably susceptible of different meanings; hence the trial court properly admitted extrinsic evidence to determine the parties' intent. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 37-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) The trial court found that the contracting parties had in fact intended the city council to adhere to the "reasonable man" standard in passing upon acceptability of a development proposal. When, as here, the evidence is uncontroverted but open to conflicting inferences, the appellate court is not bound by the trial court's interpretation but must itself assume the responsibility of interpretation. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].)

In ascertaining the contracting parties' intent, a court may look to the circumstances surrounding the written agreement, including its object, nature and subject matter and the preliminary negotiations of the parties. (Civ. Code, § 1647; Code Civ. Proc., § 1860; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.,* 20 Cal.2d 751, 761 [128 P.2d 665].) Guntert had leased Banner Island for many years. The property's location relative to downtown Stockton made it the target of various civic and commercial development schemes. In 1962 a "Stockton Plaza" proposal caused the city to give Guntert only a three-year lease, which was later extended for one year. The plaza project did not materialize.

In 1966 Guntert and the city entered into a new five-year lease, which gave the city a 30-day termination option. In 1969 city officials entered into discussions with a group of developers who formed Channel Land

Company. The developers' concept evolved from relatively modest beginnings into a larger project, embracing an apartment building, office building and, on Banner Island, a $6,000,000 motel. In June 1970, at the recommendation of the Marina Committee, the city council directed that Guntert's lease be terminated on 30 days' notice. As a result of Guntert's protests, the city council rescinded its termination resolution.

While negotiations for renewal of Guntert's lease took place, members of the city manager's office continued discussions with Channel Land Company. Ultimately Guntert and the city agreed upon an extension of the Banner Island lease for five years from its then termination date (June 1971) with a lessee's option for an additional five-year term, subject, however, to the city council's described power to terminate upon 18 months' notice. The termination provision was drafted in relationship to the city officials' continued interest in Channel Land Company's development scheme, which now envisioned a 12-story, $9,000,000 hotel on Banner Island. After an exchange of drafts, Guntert's attorney and the city attorney agreed on a clause which would permit the city to give notice of termination when and if arbitrators found that the developers, i.e., Channel Land Company, had ability to finance their proposal. At a city council meeting on July 27, 1970, several councilmen objected, believing that the decision to terminate should be made by the council as a body, rather than by arbitrators. Following the meeting, the city attorney consulted with the city manager's staff and redrafted the termination provision in its present form, that is, to give the city council "sole discretion" to determine the developers' financial capability (see fn. 2, *ante*). The new draft was discussed at a city council meeting the evening of August 3, 1970. Guntert and his attorney were present. At the meeting Guntert's attorney sought assurances that the "sole discretion" verbiage would not permit the city council to act arbitrarily or capriciously. The city attorney so advised the city council.[3] The city council then adopted a resolution approving the city attorney's draft of the lease extension and termination clause.

---

[3]At the trial the city attorney described his oral advice to the city council at its meeting of August 3, 1970:

"Q. Did you give the City Council legal advice on the subject of what was the legal affect [*sic*] of the language 'sole discretion' in the cancellation clause that was then before them?

"A. I think I did.

". . . . . . . . . . . . . . . .

"A. I think my statement was that if their action, if the Council's action was arbitrary and capricious, yes, that he would certainly have a right to attack it in court as he would whether that language is in or not.

". . . . . . . . . . . . . . . .

The circumstances created discordant interests on the part of lessor and lessee. To promote the possibility of an urban commercial development on Banner Island, the city officials wished maximum freedom to terminate Guntert's industrial operation. To abet retention of his industrial site, Guntert needed restrictions upon the city's power to terminate; specifically, he needed protection against the risk that he might be ejected for the sake of an ephemeral scheme from promoters without reasonable ability to finance it. Realism discourages an interpretation which ascribes to either party a complete surrender of self-interest.

As ultimately accepted, the clause was designed to bring these discordant aims into relative harmony. Interpreted in the light of the parties' situation, the "sole discretion" phrase was designed to identify the city council as the decision maker, not to arm it with arbitrary power. The oral advice by attorneys for both parties preceding the city council's approval of the contract fully confirms the interpretation inferred from the circumstances. As did the trial court, we interpret the contract to impose the "reasonable person" standard on the city council.

Contrary to the city's contention, the phrase "sole discretion" does not necessarily imply arbitrary power, unfettered by the demand for reasonableness. (See *Coats* v. *General Motors Corp.*, 11 Cal.2d 601, 607 [81 P.2d 906]; *Sanford* v. *Smith,* 11 Cal.App.3d 991, 1000 [90 Cal.Rptr. 256]; *Tamelleo* v. *New Hampshire Jockey Club, Inc.* (1960) 102 N.H. 547 [163 A.2d 10, 13]; *Theatre Festival, Inc.* v. *Moses* (1959) 16 Misc. 2d 258 [181 N.Y.S.2d 364, 366]; *Lucas* v. *Lucas* (Tex.Civ.App. 1962) 365 S.W.2d 372, 376.)

The city cites *Mattei* v. *Hopper, supra,* 51 Cal.2d 119, to support its claim to the subjective test of satisfaction. There the court held that a

---

"A. I don't think I mentioned good faith. I said if their action was arbitrary, capricious that they could be attacked successfully, yes."

Mr. Barbour, attorney for Guntert, testified:

"THE WITNESS: We were afraid that language might be construed to prevent us from questioning any action of the council as unreasonable or arbitrary.

"THE COURT: Was this said in open council?

"THE WITNESS: It was.

"THE COURT: Go ahead.

"THE WITNESS: In open council it was discussed, and in open council we were advised that the council would feel bound—

"THE COURT: By whom, the attorney? By members of the council?

"THE WITNESS: All right. We had discussion of that by several members of the council, and Mr. Langdon [the city attorney] rendered his opinion to the council that our rights would be preserved under the lease to question the judgment of the council in its determination. And on that basis, why, we accepted the language."

commitment to purchase land for a shopping center if leases were obtained "satisfactory to the purchaser," was not an illusory promise. The court observed: " . . . it would seem that the factors involved in determining whether a lease is satisfactory to the lessor are too numerous and varied to permit the application of a reasonable man standard." (*Id.* p. 123.)

In *Mattei* the issue was the binding or illusory character of the purchaser's commitment, not a selection between the objective and subjective tests; either test would have generated a binding commitment. Here the problem is interpretive, that is, to select the appropriate test intended by the particular parties before the court. In *Mattei* the court voiced the generalization that decisions as to commercial value or quality cannot be claimed arbitrarily or unreasonably. (*Id.* at p. 123; see also, *Weisz Trucking Co.* v. *Emil R. Wohl Constr.*, 13 Cal.App.3d 256, 262 [91 Cal.Rptr. 489].) In *Kadner* v. *Shields, supra,* 20 Cal.App.3d at page 263, the court distinguished *Mattei* from other cases dealing with commercial acceptability, pointing out that *Mattei* involved elements outside the realm "of possible financial pitfalls." The *Mattei* case is not persuasive of the present contract's meaning.

## IV

■ The city charges lack of evidentiary support for the principal findings. Although the briefs analyze the evidentiary underpinnings for a number of trial court findings, the appeal permits narrower disposition. In composite, the findings and conclusions announce the trial court's decision on a pivotal fact issue—that the city council acted arbitrarily and unreasonably in finding that Channel Land Company had financial ability to complete its development project. If this finding is sustained, the city's attempt to terminate the Guntert lease was ineffectual.

■ When a finding is attacked for lack of evidentiary support, appellate review is limited to ascertaining whether substantial evidence, contradicted or uncontradicted, supports the finding. (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

■ In evidence is a report of the city manager to the city council's Marina Committee dated February 23, 1972, describing Channel Land Company's proposal. The report described a preliminary "ground lease agreement" which the city and Channel Land Company would execute. The agreement would call upon the city council to terminate the Guntert lease and deliver the Banner Island premises (cleared of all structures) to Channel Land Company within 23 months thereafter. Channel Land Com-

pany would then build a 302-room hotel on the property and, upon completion of the hotel, would take a 50-year ground lease from the city at a fixed sum plus a percentage of hotel revenues. After receiving possession of Banner Island in its cleared condition, Channel Land Company would put up a $50,000 performance bond and place the 50-year ground lease in escrow for 90 days, within which it would produce a "firm commitment" for hotel construction funds; if it failed to produce such a commitment, the bond would be forfeited and the ground lease terminated. In addition to the hotel on Banner Island, Channel Land Company would build on adjacent property a six-story apartment complex, two office towers and related facilities at an estimated aggregate cost exceeding $17,000,000.

The city manager's report included no financial statement of Channel Land Company. Attached as an exhibit was a letter from a well-known hotel management firm, enclosing an unexecuted form of hotel management contract customarily used by the firm and expressing interest in developing a "specific contract." Other attachments were letters from two mortgage brokerage firms, expressing interest in financing Channel Land Company's proposed hotel. Both letters spoke only in terms of possibilities to be developed by future negotiation; neither amounted to a commitment to secure or lend construction funds. Nevertheless, the city manager's report to the Marina Committee referred to these two letters as "commitments" which would be renewed upon recordation of the 50-year ground lease.

On February 28, 1972, the Marina Committee reported to the city council that it had reviewed the city manager's report; that it agreed with the city manager that the proposal was a "bona fide offer." The committee recommended city council acceptance of the offer. There is no evidence that the Marina Committee had requested or received a financial statement of Channel Land Company or that it had before it any showing of the company's borrowing capability other than the preliminary, noncommittal letters of the two mortgage brokers.

In evidence is a transcript of the city council meeting held later the same day, at which the council adopted the Marina Committee's recommendations. There is no evidence that the council had any more information concerning Channel Land Company's financing capacity than did the city manager or the Marina Committee. At the council meeting there was a specific discussion of Channel Land Company's proposal to supply a "firm commitment" for financing only after Banner Island had been cleared and placed in its possession.

Later, at the trial, the city manager and members of his staff testified that no firm financing commitment for the hotel project was to be expected until Banner Island had been cleared and its possession delivered to Channel Land Company under an executed ground lease.

Mr. Barbour, Guntert's attorney, testified that on February 24, 1972, the day after the city manager's report to the Marina Committee, he asked the city manager whether Channel Land Company had supplied any evidence of financing ability other than the leases from the two mortgage brokers. He described the city manager's response: "His basic response was that, number one, that he did not have any more information to put in his report and, secondly, he said to me, 'Bob, I know these people don't have the ability to finance this thing.' But he said, 'The City has a very strong interest in trying for a marina development and we will never be able to get one as long as Guntert's on that land.' "

So summarized, the evidence is substantial that the Stockton city officials had before them no information permitting a reasonable determination that Channel Land Company possessed ability to finance its proposed development. Substantial evidence supports the trial court's findings that the city council's lack of information regarding Channel Land Company's financing ability resulted in a decision which was unreasonable and arbitrary.

In assailing the findings, the city argues that ability to finance the project connoted no more than ability to borrow money at interest (see *duQuesnay v. Henderson,* 24 Cal.App.2d 11, 14 [74 P.2d 294]); charges the trial court with error in requiring the developers to show a "current agreement or commitment" for financing; contends that the lease termination clause did not call for a "firm commitment;" argues that customary real estate financing practices permitted a firm construction loan commitment only when the developers had a long-term lease in hand.

At this point the city is really repeating its interpretive argument. The Stockton city officials were doubtless realistic in recognizing Channel Land Company's inability to secure a firm financing commitment in advance of Guntert's removal. This inability, however, was personal to the developer. Another developer might have had the assets or credit to accompany its proposal with a persuasive financial statement or a firm loan commitment, however prospective. As we have observed, the inferred intent of the lease termination provision was to prevent removal of Guntert's industrial plant for the sake of a development proposal which might founder for lack of financing. In that eventuality the city might receive the fruits of the de-

velopers' $50,000 performance bond; Guntert, on the other hand, would have lost his plant. Except for two expressions of preliminary interest from financing houses, the city officials had nothing before them on which to base a determination of Channel Land Company's financing ability. Their decision, as a consequence, was unreasonable and arbitrary.

■ The city relies upon the thesis that a court may not inquire into the motives or substitute its judgment for that of a municipal legislative body. That thesis is relevant in the domain of governmental discretion delegated by law. Once it has entered into a valid contract, a municipal corporation's contractual obligations are subject to the same rules of interpretation and the same liabilities as those of a private person. (*Carruth* v. *City of Madera,* 233 Cal.App.2d 688, 695-696 [43 Cal.Rptr. 855]; 10 McQuillin on Municipal Corporations, § 29.124.)

## V

Invalidity of the city council's decision relative to Channel Land Company's financing ability is enough to void the notice of termination of the Guntert lease. Although the briefs debate the evidentiary support for the findings which attribute lack of bona fides to the development proposal and lack of good faith to the city council, resolution of these debates is not necessary to disposition of the lawsuit.

The city charges procedural error in the trial court's issuance of a permanent injunction almost two months before settlement of the findings of fact and conclusions of law. It cites decisions holding that a final judgment may not be rendered until the court has made findings on all material issues. (See, e.g., *James* v. *Haley,* 212 Cal. 142, 147 [297 P. 920]; *Perry* v. *Jacobsen,* 184 Cal.App.2d 43, 49 [7 Cal.Rptr. 177].) Although, as we have noted, the injunction was an appealable order, it was not the "final judgment." Possibly the trial court should have viewed it as a judgment and settled findings in advance, in conformity with California Rules of Court, rule 232. If so, the departure was not reversible error unless prejudice resulted. (*Estate of Cooper,* 11 Cal.App.3d 1114, 1121-1122 [90 Cal.Rptr. 283].) The city shows no prejudice.

There are other claims of error in various findings and in several rulings of law. The central issues in the lawsuit were: (a) the interpretation of the lease termination clause and (b) sufficiency of the city council's effort to invoke it. Both these issues were decided adversely to the city and correctly so. The city must therefore lose the lawsuit. If errors peripheral to

these central issues appear, they would not change the lawsuit's outcome, hence are not prejudicial.

The order granting injunction is affirmed.

Richardson, P. J., and Puglia, J., concurred.