[Civ. No. 14752. Third Dist. Jan. 12, 1976.]

RONALD M. GUNTERT et al., Plaintiffs and Respondents, v.
CITY OF STOCKTON, Defendant and Appellant.

## COUNSEL

Monroe Langdon and Paul F. Mordy, City Attorneys, Perry H. Taft, Assistant City Attorney, Wilson & Hoslett and John A. Wilson for Defendant and Appellant.

Brobeck, Phleger & Harrison, Malcolm T. Dungan, Thomas A. Welch and Jeffrey S. Kingston for Plaintiffs and Respondents.

## OPINION

**FRIEDMAN, Acting P. J.**—Plaintiff Guntert and two wholly owned corporations operate a steel construction and machinery business on a seven-acre tract called Banner Island leased from the City of Stockton. A clause of the lease permits termination by the lessor on 18 months' written notice when and if the city decides to accept a bona fide development offer from third parties.[1] In March 1972 the city received what its governing officials viewed as an attractive development offer. They gave Guntert notice of termination. Guntert and his two corporations filed an injunction and damage suit, charging invalidity of the notice of termination.

A bifurcated trial took place. The first phase of the trial dealt with the parties' substantive claims and with Guntert's prayer for injunctive relief against the city's termination effort. At the conclusion of the first trial phase, the court entered findings declaring that the city had acted unreasonably, arbitrarily, without good faith and in breach of its

---

[1] The termination clause reads as follows: "From and after the date of this Agreement, Lessor [City of Stockton] shall have the right to terminate said Lease dated June 1, 1966, upon eighteen (18) months' written notice to Lessee, when the City Council of Lessor has received and agreed to accept a bona fide offer or proposal to develop the demised premises . . . . The determination as to the validity of said offer or proposal and the economic feasibility and the ability to adequately finance said development shall be at the sole discretion of said City Council."

contractual duty to inquire into the bona fides of the third parties' development offer. The court concluded that the notice of lease termination was a nullity and issued an injunction against dispossession of Guntert. In November 1974 we affirmed the judgment of injunction. (*Guntert* v. *City of Stockton,* 43 Cal.App.3d 203 [117 Cal.Rptr. 601].)

In the meantime the trial of Guntert's damage claim had gone forward. The trial culminated in findings and a judgment awarding Guntert $553,812.81 (representing lost profits and out-of-pocket losses to the date of trial) plus a monthly sum of $13,442.53 (representing future lost profits) from February 1974 through December 1979, or until earlier termination of the lease. We now consider the city's appeal from the money judgment.

I

■ The city claims lack of substantive liability for damages. It points out that Guntert did not vacate the leased property but remained in possession. The city's thesis runs approximately as follows—no cause of action for constructive eviction arises unless the tenant vacates the premises; a lessor who does not physically eject the tenant but rather seeks to oust him through an invalid notice of termination or an unsuccessful lawsuit is liable for damages only if his action was malicious; the trial court's findings of unreasonableness and even of lack of good faith are not tantamount to a finding of malice.

The city's position is not well taken. ■ In every lease the landlord impliedly covenants that the tenant shall have quiet enjoyment and possession of the premises. In California this covenant is partially expressed in Civil Code section 1927, which guarantees the tenant against rightful assertion of a paramount title. Beyond the statutory covenant, the landlord is bound to refrain from action which interrupts the tenant's beneficial enjoyment. (*Brown Derby Hollywood Corp.* v. *Hatton,* 61 Cal.2d 855, 858 [40 Cal.Rptr. 848, 395 P.2d 896]; *Carter* v. *Adler,* 138 Cal.App.2d 63, 70-71 [291 P.2d 111]; 49 Am.Jur.2d, Landlord and Tenant, § 336, p. 351.) ■ As construed by the trial court and by this court on the prior appeal, the Guntert lease imposed upon the lessor an obligation whose breach profoundly impaired the tenant's beneficial enjoyment.

A preliminary provision of the lease recited that the lessee would use the property for heavy steel construction and for constructing barges and

other watercraft, Guntert's business included construction of ships, tugs, barges, floating cranes, dredges and specially designed equipment. It built and rented out highway and canal paving machines. According to the findings, many of the "to order" products required extended completion time; income from a particular job might be received months, even years, after its completion; a sustaining backlog of major work was required in order to provide a continuing flow of income.

As construed on the earlier appeal, the termination clause imposed upon the city a duty to investigate and make a reasonable determination of the bona fides of the development proposal for whose sake it was terminating Guntert's tenancy. (43 Cal.App.3d at p. 213.) The city did not fulfill that duty; rather, with no investigation of the developer's financing ability, it arbitrarily and unreasonably gave Guntert the 18-month termination notice. (43 Cal.App.3d at p. 216.) Immediately after the March 1972 termination notice, Guntert filed suit, seeking an adjudication of the notice's invalidity.

The termination notice initiated a state of uncertainty which seriously damaged Guntert's business. Pending the outcome of the lawsuit, Guntert had no assurance that his manufacturing plant could occupy the leased premises past the threatened date of eviction, i.e., September 1973. The trial court found that this uncertainty prevented Guntert from undertaking commitments and from bidding on manufacturing jobs. Although the court issued its permanent injunction in April 1973, the city's appeal perpetuated Guntert's inability to predict continued access to his manufacturing plant. Not until January 1975, 60 days after we affirmed the injunction judgment, was the nullity of the termination notice finally adjudicated.

The trial court found that the city's invalid notice of termination directly caused an unanticipated "wind-down" of Guntert's business. The arbitrary and unreasonable notice of termination violated the lessor's implied obligation to abstain from interference with the tenant's use and enjoyment of the premises. ■ Upon a lessor's breach of lease, the tenant has a choice of remedies. If the broken covenant is a condition precedent in the contract sense, he may elect to move out, cease payment of rent and under some circumstances seek damages. (3 Witkin, Summary of Cal. Law, Real Property, §§ 505, 506.) He also has the alternative of continuing under the lease and suing for breach-of-contract damages. (*Kulawitz v. Pacific etc. Paper Co.*, 25 Cal.2d 664, 672 [155 P.2d 24]; see also *McAlester v. Landers*, 70 Cal. 79, 82-84 [11 P.

505].) Guntert chose the latter alternative. At no point did he surrender possession of the leased premises.

A number of decisions describe a rule declaring that a nonphysical interference with the tenant's enjoyment constitutes a constructive eviction; that the tenant may not recover for the eviction unless he first vacates the premises. (*Veysey* v. *Moriyama,* 184 Cal. 802, 805-806 [195 P. 662, 20 A.L.R. 1363]; *Clark* v. *Spiegel,* 22 Cal.App.3d 74, 79-80 [99 Cal.Rptr. 86]; *Slater* v. *Conti,* 171 Cal.App.2d 582, 585 [341 P.2d 395]; *Lori, Ltd.* v. *Wolfe,* 85 Cal.App.2d 54, 65 [192 P.2d 112]; 3 Miller & Starr, Current Law of Cal. Real Estate, § 1022, p. 442; see also *Green* v. *Superior Court,* 10 Cal.3d 616, 625-626, fn. 10 [111 Cal.Rptr. 704, 517 P.2d 1168].) Another version of the rule is that the covenant of quiet enjoyment is not breached until there has been an actual or constructive eviction. (*Standard Livestock Co.* v. *Pentz,* 204 Cal. 618, 625 [269 P. 645, 62 A.L.R. 1239]; *Petroleum Collections Inc.* v. *Swords,* 48 Cal.App.3d 841, 847 [122 Cal.Rptr. 114]; see Annots., 62 A.L.R. 1257, 41 A.L.R.2d 1414.)

Stated in these flat terms, the rule would preclude a tenant from seeking damages for a breach of quiet enjoyment not amounting to an eviction. Stated in these terms, the rule is incomplete, for it fails to recognize the tenant's choice of remedies for breach of the lease, namely, his option to stand upon the lease and sue for damages. *(Kulawitz* v. *Pacific etc. Paper Co., supra.)* Decisions in other states draw a distinction—the rule demanding surrender of the premises preceding a suit for impairment of quiet enjoyment is inoperative where the tenant elects to stand upon the lease and claim damages. (*Carner* v. *Shapiro* (Fla.) 106 So.2d 87, 89; *Keating* v. *Springer,* 146 Ill. 481 [34 N.E. 805]; *Kuiken* v. *Garrett,* 243 Iowa 785 [51 N.W.2d 149, 155, 41 A.L.R.2d 1397]; *Winchester* v. *O'Brien,* 266 Mass. 33 [164 N.E. 807, 64 A.L.R. 895]; *Moe* v. *Sprankle,* 32 Tenn.App. 33 [221 S.W.2d 712]; *Ennis* v. *Ring,* 56 Wn.2d 465 [353 P.2d 950, 953]; see also 1 Tiffany, Landlord and Tenant (1910) § 79, p. 540.)

Several California cases pursue a parallel line but without explicating the distinction. The lessor's covenant of quiet enjoyment may be breached by something less than complete ouster, that is, "some act of molestation, affecting, to his prejudice, the possession of the covenantee." (*Black* v. *Knight,* 176 Cal. 722, 725 [169 P. 382], quoting *Levitzky* v. *Canning,* 33 Cal. 299.) In *Levitzky* the landlord's activities deprived the tenant of the economic benefits of the lease; the tenant's claim to

damages was upheld even though he remained in possession of the premises. Similarly, *Agoure* v. *Lewis,* 15 Cal.App. 71, 76 [113 P. 882], holds that a tenant in possession may recover damages for breach of the covenant of quiet possession.

Other cases voice a rule upon which the city relies—that a landlord's unsuccessful attempt to oust the tenant by a notice of termination or lawsuit is not actionable unless characterized by bad faith or malice. (See, e.g., *Lindenberg* v. *MacDonald,* 34 Cal.2d 678, 683 [214 P.2d 5, 14 A.L.R.2d 1436]; *Black* v. *Knight, supra,* 176 Cal. at p. 726; *Asell* v. *Rodrigues,* 32 Cal.App.3d 817, 824-825 [108 Cal.Rptr. 566].) That rule holds sway where the tenant quits the premises and sues for wrongful eviction. Guntert is not suing for a wrongful, constructive eviction but for the lessor's unjustified and unauthorized interference with his profitable use of the leased property. The rule requiring ouster or surrender prior to suit for wrongful eviction does not preclude the tenant from his election to stand upon the lease, remain in possession and sue for breach of contract damages. *(Kulawitz* v. *Pacific etc. Paper Co.)* It should be unnecessary to observe that a breach of contract is actionable without requiring the plaintiff to establish bad faith or malice. We affirm Guntert's substantive entitlement to damages.

## II

Although Guntert as an individual was the sole lessee, he conducted his business through two corporations, Guntert and Zimmerman Construction Division, Inc. (Construction Division) and Guntert Sales Division, Inc. Guntert was the sole stockholder of both corporations. Both corporations are plaintiffs. All the damages awarded by the trial court were predicated on profit losses suffered by Construction Division as a result of the city's unlawful attempt to terminate the lease.

Contrary to the city's contention, the award for Construction Division's lost profits was lawful even though the latter was not a formal party to the lease. Although the lease created a single tenancy, Construction Division was one of the beneficiaries. The lease expressly named both corporations as occupants of the premises; collectively, the occupants could recover damages suffered by Construction Division by showing that it was an entity for whose benefit the contract was made. *(Lucas* v. *Hamm,* 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685]; see 1 Witkin, Summary of Cal. Law, Contracts, § 507, p. 435.) This showing was accomplished, for the trial court found that the group of plaintiffs

were the intended and acknowledged tenants of the leased land; that Construction Division had been engaged in conducting the heavy equipment and boat-building phases of the Guntert enterprises on the leased property ever since 1946; that Construction Division's continued conduct of this business was contemplated by the parties as the purpose of the 1966 lease.

III

■ The measure of damages for a breach of lease is that established by Civil Code section 3300 in breach of contract cases—an amount which will compensate the aggrieved party for all the detriment caused by the breach or which in the ordinary course would be a likely result. (*Standard Livestock Co.* v. *Pentz, supra,* 204 Cal. at p. 642.) The judgment awarded $553,812.81 as past damages. A major component was the sum of $274,227.58, representing the trial court's finding of loss of profits from March 1972 (the month of the termination notice) to December 1, 1973.[2] This award, covering a 21-month period, calculated Construction Division's lost profits at an annual rate of $161,310.34 and a monthly rate of $13,442.53. The last figure also represents the court's finding relative to the monthly rate of future profits Construction Division would lose during the post-trial period.

■ The city charges lack of evidence to support these findings. The inquiry on appeal is whether the award is supported by substantial evidence; the appellant has the burden of demonstrating error in the determination. (*City of Salinas* v. *Souza & McCue Construction Co.,* 66 Cal.2d 217, 225 [57 Cal.Rptr. 337, 424 P.2d 921].) Substantial evidence means such evidence as a reasonable fact trier might accept as adequate to support a conclusion; evidence which has ponderable legal signifi- cance, which is reasonable in nature, credible and of solid value. (*United Professional Planning, Inc.* v. *Superior Court,* 9 Cal.App.3d 377, 393 [88 Cal.Rptr. 551]; *Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54].)

---

[2]Although the matter is not fully explained in the briefs. two reasons appear for selecting December 1, 1973, as the separation point between past and future losses. The damage trial took place in December 1973. On November 1, 1973. Construction Division decided to wind up its business. According to the findings. efforts to find an alternate plant site had been unsuccessful; a number of employees. including key employees. had left because of employment insecurity and lack of work attributable to Construction Division's inability to undertake long-term projects: the closure of Construction Division would abate the continuing outflow of overhead costs.

The mathematics of the findings and judgment are not fully explainable. The period for the award of past profit losses is 21 months. Multiplication of the monthly loss of $13,442.53 by 21 results in a product of $282,293.13 rather than $274,227.58.

In reviewing a damage award of lost business profits, the appellate court must couple the substantial evidence concept with recognition that evidentiary imponderables are unavoidable. ■ A tenant may recover anticipated profits lost as the natural and direct consequence of the lessor's breach; they need not be established with certainty; it is enough to show as a reasonable probability that the profit would have been earned except for the breach. (*Nelson* v. *Reisner,* 51 Cal.2d 161, 171-172 [331 P.2d 17]; see also *Green* v. *Superior Court,* 10 Cal.3d 616, 638-639 [111 Cal.Rptr. 704, 517 P.2d 1168].) Once the fact of damages is established, the difficulty of ascertainment will not prevent recovery. (*Stott* v. *Johnston,* 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R.2d 580]; see Dunn, *Recovery of Damages for Lost Profits in California,* 9 U.S.F. L.Rev. 415, 423-424.) The law will allow reasonably calculated damages even if the result is only an approximation; the wrongdoer cannot complain if his own condition creates a situation in which the court must estimate rather than compute. (*Distribu-Dor, Inc.* v. *Karadanis,* 11 Cal.App.3d 463, 470-471 [90 Cal.Rptr. 231]; *Benard* v. *Walkup,* 272 Cal.App.2d 595, 606 [77 Cal.Rptr. 544].)

These general parameters avoid harsh and overly technical demands for certainty of proof; yet must be applied cautiously and with an eye to variations in the kind of loss. The breach, hence the loss of profit, may be limited to a single order for merchandise or service, having little impact on the plaintiff's remaining business. When an entire business is wrongfully interrupted and injured, the measure of damages is the decrease in volume traceable to the wrong, as reflected by loss of profits, expenses incurred or similar concrete evidences of injury. (*Steiner* v. *Long Beach Local No. 128,* 19 Cal.2d 676, 689 [123 P.2d 20].)

■ Historical data supply an acceptable basis for ascertaining lost or diminished benefits suffered by an established business. The occurrence and extent of lost profits may be ascertained with reasonable certainty from the working experience of the business, from its past volume and from other data reflecting probable future volume. (*Natural Soda Prod. Co.* v. *City of L. A.,* 23 Cal.2d 193, 199 [143 P.2d 12]; *Lucky Auto Supply* v. *Turner,* 244 Cal.App.2d 872, 882 [53 Cal.Rptr. 628].) "In these situations, trial courts must do the best they can and use all available facts to approximate the fair and reasonable damages under all of the circumstances." (*Green* v. *Superior Court, supra,* 10 Cal.3d at pp. 638-639.)

■ Jobs of large value, long duration and deferred income (described as "C" jobs) formed the major part of Construction Division's business. Many of these "C" jobs consisted of marine vessels and heavy specialty equipment built to order; others consisted of highway and canal paving equipment which Construction Division leased out with options to purchase. Relatively small orders were carried in a Miscellaneous Job Account. A continual backlog of "C" jobs was necessary in order to provide a sustained flow of revenue. Guntert's testimony showed frequent resort to bank financing to meet manufacturing costs pending future receipt of sales revenue and rental income. Construction Division's books were maintained on a cash basis; its regular fiscal year ended on the last day of each February.

According to the findings, Construction Division had been preparing to bid on a multi-million dollar, ferry boat construction project prior to the city's abortive termination notice. If valid, the March 1972 termination notice would force Construction Division to vacate its plant in September 1973. Although plaintiffs were resisting the threat of eviction, they were uncertain of victory in the courts. Consequently Construction Division refrained from bidding on the ferry boat project. Similarly, the firm had to forego numerous other jobs in the "C" category. Efforts to expand the "small job" category proved unsuccessful. The findings declare that after March 1, 1972, Construction Division's income was derived from work orders which originated prior to that date; that work originating and performed after that date supplied no profit. According to the findings, gross income in March 1972 and the following months resulted from jobs completed prior to that time; hence, it was "pure revenue;" the costs incurred to produce it had been met in prior fiscal periods.

As evidence of Construction Division's profits preceding the March 1972 breach, plaintiffs submitted tabulations covering a six-year span of business history up through February 1972. These tabulations depicted Construction Division's annual changes in net worth, adjusted by various factors, during the six-year period. At no time during the history of this one-man corporation had Construction Division paid dividends or distributed profits. Therefore, according to plaintiffs' theory, annual gains in net worth, with appropriate adjustments, would reflect annual before-tax earnings. These tabulations showed a total gain in adjusted worth of $967,862.04 during the six-year period. This sum supplied an annual average of $161,310.34 and a monthly average of $13,442.53,

which the trial court accepted as Construction Division's history of profit prior to the breach.

The findings establish a reasonable probability that the city's abortive attempt to terminate the lease caused Construction Division to suffer virtually complete loss of the incoming "C" type job orders needed to maintain a sustained flow of revenue. The city's evidentiary attack is centered on the accounting data designed to show a six-year history of profit antedating the breach.

Profit and loss statements, not periodic balance sheets, represent the orthodox, expected method of demonstrating a history of profit and loss. The "adjusted net worth" evidence presented by plaintiffs and accepted by the trial court represented an unconventional, artificial method of showing a shift from a history of profit to one of loss. Prime justification for this artificial method lay in the fact that expenses were habitually incurred in one fiscal period to produce gross revenue in a later fiscal period. Profit and loss statements for the period following the breach might show a heavy cash-basis profit without reflecting diminution in the backlog of work orders needed to assure a continued flow of income. Only after an extended interval and over a period of time would the diminishing work orders result in diminished cash flow. Profit and loss statements, extracted from cash-basis accounts, would fail to mirror the damage to anticipated profit at the time the damage occurred. Some artificial method of portrayal was inevitable.

Construction Division's cash-basis financial statements (prepared annually as of its fiscal year ending the last day of February) formed the starting point for its six-year tabulation of average annual profit. From these annual statements Mr. Guntert had prepared a six-year tabulation reflecting annual fluctuations in net worth, adjusted to confine these fluctuations to changes in plant operating revenue. Mr. Guntert took the stand to explain the various adjustments used to eliminate extraneous factors. Certified public accountants testified on each side. Although Construction Division's books were maintained and income taxes computed on a cash basis, its accountants also prepared semiannual audits on an accrual basis to meet the demands of surety companies which put up bid bonds. Mr. Lewis, plaintiffs' accountant, compared Construction Division's operations to those of a building contractor, whose business operations were more accurately portrayed by accrual rather than cash accounting. Utilizing the accrual-basis audits prepared for the bonding companies, Mr. Lewis had prepared accrual-basis

statements which confirmed generally the accuracy of the cash-basis computations contained in Mr. Guntert's tabulation.

Construction Division's books had been made available to defendant's accounting witness, Mr. Snell. Although Mr. Snell criticized plaintiffs' six-year tabulation in some respects, he conceded that his criticism was not directed at the "total amount." In sum, Mr. Snell did not refute plaintiffs' method of demonstrating historic profits.

The data of profit loss would not stand up to post-audit by a certified public accountant. Yet it represented a fairly reasonable mode of objectifying data doomed to incorporeality by defendant's breach. In view of the testimony of the two accountants, the trial court was justified in viewing plaintiffs' tabulation as a valid method of establishing, first, a six-year history of profit antedating the breach and, second, a reasonable approximation of the rate of profit lost as a result of the breach.

## IV

 Much of the city's argument goes to the weight of the fiscal data. The city makes a highly selective attack on the six-year tabulation of net worth. According to that tabulation, net worth attributed to operating profits rose $967,000[3] over the six-year period from February 1966 to February 1972. Most of this increase occurred during the first two of the six years. The city arbitrarily selects the last four of the six years, during which net worth decreased $203,000; *ergo,* the city argues, Construction Division was losing money during the period preceding March 1972.

The argument rests upon a non sequitur. Although the tabulation shows losses during two of the last four years, it shows gains in the other two. Moreover, the 1972-1973 fiscal year shows a gain attributable to job orders initiated in prior years. Plaintiffs provided a measure of support for their claim of lost profit potential by placing in evidence a tabulation of major jobs not bid because of uncertainties created by the invalid termination notice. The trial court was justified in concluding that a continuance of the historic rate of profit would have occurred had it not been for the breach. (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* 23 Cal.2d at p. 200.) The evidence of a general course of profitable business and of its interruption by the city's wrongful act was substantial in the sense that it was "reasonable in nature, credible, and of solid value." (*Estate of Teed, supra,* 112 Cal.App.2d at p. 644.)

---

[3] At this juncture we round off the figures for the sake of simplicity.

Despite the general acceptability of plaintiffs' evidence of historic profits, the city has demonstrated several errors affecting the court's finding of $13,442.53 as the average monthly rate of damage. Plaintiffs' net worth figures were ostensibly adjusted to reflect only those changes due to fluctuations in operating revenues and to eliminate extraneous elements. Changes in the value of fixed assets are irrelevant to operating profits. Notwithstanding, a $50,000 increase in the value of "Facilities & Property" was permitted to find its way into the computation of net worth for the fiscal year ending February 1968.

Another error arose from the failure to consider a compromise settlement of two accounts receivable. These had been listed in the net worth tabulation as assets aggregating $118,775.87. During trial Guntert agreed with the customers to accept $99,000 in full settlement of these two accounts. The difference, amounting to $19,775.87, should have been (but was not) reflected by a decrease in net worth.

The erroneous utilization of these two factors resulted in an unjustified increase in the six-year computation of historic profit. The historic profit of $967,862.04 over the six-year span should be reduced by $69,775.87 (the aggregate of the $50,000 and the $19,775.87 items), reducing the six-year aggregate to $898,086.17. The historic profit used as the basis for calculating plaintiffs' damages must therefore be reduced from an annual average rate of $161,310.34 to one of $149,681.03 and from a monthly average rate of $13,442.53 to $12,473.42.

The trial court also erred by accepting March 1, 1972, as the date of breach for the purpose of computing Construction Division's loss of profit. The breach occurred on March 15, 1972, the date of the wrongful notice of termination. The computation of damages at a fixed monthly rate from the date of breach to a date preceding trial is at best an artificial means of arriving at a reasonable approximation of plaintiffs' loss. Nevertheless, the computation should not be expanded by including a time period preceding the actual breach of contract.

V

The remaining component of the $553,812.81 judgment for past damages was the sum of $279,585.23 claimed as out-of-pocket, excessive overhead costs attributable to the breach and incurred in the 20-month period from March 1, 1972, through October 31, 1973. As reflected in the findings, this part of the award was predicated on the

theory that the lease anticipated an orderly "wind-down" of Construction Division's business, either toward the end of the lease term or during the 18 months following a valid notice of termination; that the City's void notice of termination forced Construction Division into an "unprogrammed and unanticipated" wind-down accompanied by excessive overhead costs which would not have been incurred during the orderly wind-down period contemplated by the lease.

Plaintiffs' "wind-down" theory has no merit. The lease was a hiring of property by a going business concern. None of the lease provisions dealt with the demise, termination or wind-down of the business at the tenancy's end. None of its provisions hampered Guntert's choice to move to another location or to shut down his business whenever he ceased to occupy Banner Island. Like most other leases, it left the tenant as a free agent at the end of his tenancy. The provision for termination upon 18 months' notice was obviously designed to give Guntert time to prepare for whatever eventuality he chose, wind-down or otherwise. In the silence of the lease, the choice was his. For aught contained in the lease, he might choose to move his plant to a new site, abstaining from any and all interruptions or reductions in work volume and work force. If, absent a breach, Guntert chose to wind down his business and suffer a relative increase in overhead costs, the choice would have been his to make at the time he made it. The finding that the lease or the parties to the lease contemplated an orderly "wind-down" receives no support from the lease or from any other evidence.

Plaintiffs' theory that the lease *contemplated* a controlled diminution of volume accompanied by a controlled cutback in overhead is premised upon the *Hadley* v. *Baxendale* theory of damages reasonably *contemplated* by the parties at the time of their contract. (See 1 Witkin, Summary of Cal. Law, Contracts, § 639, pp. 542-543.) Regardless, there is no evidence that the city's abortive termination attempt caused Construction Division's loss of "excess" overhead costs as found by the trial court.

The trial court awarded plaintiffs' recovery for profits they would have gained had it not been for the breach. Profits recovered as the proximate result of a breach are the excess, the net, of revenue over costs; usually they are synonymous with net earnings. (*Kuffel* v. *Seaside Oil Co.,* 11 Cal.App.3d 354, 366 [90 Cal.Rptr. 209]; *Olcese* v. *Davis,* 124 Cal.App.2d 58, 62-63 [268 P.2d 175]; *Oakland Cal. Towel Co.* v. *Sivils,* 52 Cal.App.2d 517, 520 [126 P.2d 651].) Net profits are the gains made from sales " ' "after deducting the value of the labor, materials, rents, and all

expenses, together with the interest of the capital employed." ' " (*Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists,* 14 Cal.App.3d 209, 223 [92 Cal.Rptr. 111].)

In limited situations, loss of profit may be fairly computed without reference to overhead. In a suit for profit lost by reason of the defendant's failure to supply or accept materials or services, the plaintiff's fixed or overhead costs might be totally unaffected by the breach, justifying the court in disregarding overhead as a portion of the cost; the gross profit would then be the equivalent of the net profit the plaintiff would have earned under the agreement. (*Dallman Co.* v. *Southern Heater Co.,* 262 Cal.App.2d 582, 593 [68 Cal.Rptr. 873]; *Oakland Cal. Towel Co.* v. *Sivils, supra;* see Annot., 3 A.L.R.3d 689, 697-704.) ■ Where as here an entire business is injured or interrupted, the measure of recovery must be the net loss, not the gross profits. Fixed or overhead costs then become an essential element in computing the lost profits forming the basis for the damage award. If overhead costs are not increased by the breach, it is error to allow them as damages. (*Allen* v. *Gardner,* 126 Cal.App.2d 335, 344-345 [272 P.2d 99].) To award the plaintiff not only lost profit but also the cost of producing the profit causes a double recovery.[4]

■ The computation which formed plaintiffs' evidence of "excess" overhead costs demonstrates that Construction Division suffered no absolute increase in overhead, but only a shift in the latter's ratio to direct costs. Plaintiffs calculated "normal" overhead at 114 percent of direct labor costs. During the fiscal year immediately following the breach, overhead was 148 percent and during the next 8-month period 183 percent of direct labor costs. Application of these respective percentages to direct labor costs for the same two periods produced a figure representing combined direct and overhead costs for the 20-month period; utilizing the last figure as a minuend, plaintiff then subtracted a product created by applying the "normal" 114 percent to the direct costs for the same 20-month period; the resulting figure was posited as a "loss" of overhead costs during the 20-month period.

---

[4] Thus a leading English text declares: "Just as expenses rendered futile by the breach may generally be claimed as an alternative to the normal measure of damages, so they may also be claimed as an alternative to recovering for gains prevented by the breach. Again, it is important to realise that such expenses form an alternative and not an additional head of damage, since they represent part of the price that the plaintiff was to incur in order to secure the gain." (McGregor on Damages (13th ed. 1972) pp. 32-33.)

Such were the delusory mathematics underlying plaintiffs' claim of "excessive" and "out-of-pocket" overhead costs. The computation displayed no actual increase in overhead but only a shift of its ratio to direct costs. Overhead was no greater than that required to produce net profit at the rate accepted by the fact trier. The trial court erred by adding to lost profit part of the expense of producing it. No substantial evidence supported the award of "excess overhead" amounting to $279,585.23.

## VI

■ An aggrieved party may recover damages resulting after commencement of his lawsuit or certain to result in the future. (Civ. Code, § 3283.) The findings declare that at the trial Construction Division asked for some assurance of 18 months' tenancy pending the city's appeal to permit it to accept a major barge construction job; that the city rejected the request; that Construction Division then decided to close down its business on November 1, 1973, in order to abate continuing overhead expense; that Construction Division's shutdown was a natural and foreseeable consequence of the situation created by the city's illegal notice of termination; that Construction Division would suffer loss of future profits at the rate of $13,442.53 per month during the remainder of the lease period. Based on these findings, the judgment directed the City of Stockton to pay this sum each month from February 1974 through December 1979 unless the lease ended earlier.[5]

Earlier in this opinion we noted that Civil Code section 3300, providing consequential damages for breach of contract, applies to actions for breach of a landlord's implied covenant of quiet possession. (*Standard Livestock Co.* v. *Pentz, supra,* 204 Cal. at p. 642.) A breach of contract may be either total or partial. ■ When a contract is totally breached, the plaintiff recovers all his damages, present and prospective, in a single lawsuit; that sort of recovery substitutes a money award for the defendant's duty to perform; it divests the court of future power to require performance or to award additional damages. (*Coughlin* v. *Blair,* 41 Cal.2d 587, 598 [262 P.2d 305].) ■ "If the breach is partial only, the injured party may recover damages for nonperformance only to the time of trial and may not recover damages for anticipated future

---

[5]The award of prospective damage commenced with the month of February 1974 in which the judgment was entered. The December 1979 date was selected because the lease would finally expire in June 1981 and Guntert, in preparation for that event, would commence to "wind down" Construction Division's operations 18 months earlier, in December 1979.

nonperformance. . . . Furthermore, even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract. . . . The circumstances of each case determine whether the injured party may treat a breach of contract as total. . . . If, as in the present case, the injured party has fully performed his obligations under a bilateral contract, courts usually treat a breach as partial . . . ." (*Id.,* at pp. 598-599; see also *Oliver* v. *Campbell,* 43 Cal.2d 298, 302 [273 P.2d 15]; Rest., Contracts, § 313.)

 Here plaintiffs elected to remain in possession, continue to pay rent and sue for a partial rather than total breach. The lease, whose prime objective was the letting of property, remained alive; the law's remedies were substituted for only a part of the contractual rights; if only by virtue of the injured party's election, the breach was partial and not total. That election was confirmed by the injunction issued at the tenant's behest. That injunction prevented the landlord from interfering with the tenant's quiet possession and use of the leased premises during the remainder of the tenancy:

By granting an injunction which assured specific performance and, in addition, a judgment for future profits available only on the theory of a total breach of the lease, the trial court awarded something akin to double recovery.[6] Plaintiffs occupy an inconsistent position—they argue (correctly) that their right to damages was not dependent upon eviction, yet they seek a measure of damages available to an evicted tenant, that is, one who no longer has a lease. The breach being partial only, the trial court erred by awarding prospective loss of profits.

Plaintiffs contend that the lease created separate obligations, running to Guntert's two corporations as well as to Guntert himself; that the city's illegal act caused Construction Division to suffer the effect of a total, not partial, breach, for which it should recover prospective as well as past profits. Plaintiffs cite *Noble* v. *Tweedy,* 90 Cal.App.2d 738, 744

---

[6]An analogy appears in the decisions dealing with damages for nuisance. If the nuisance is permanent, the landowner may recover past and prospective damages; if the defendant can or is required by decree to abate the nuisance, the plaintiff's damages are limited to those suffered in the past and may not include speculative future losses based upon the assumption that the nuisance will continue. (*Spaulding* v. *Cameron,* 38 Cal.2d 265, 268-269 [239 P.2d 625]; *Polin* v. *Chung Cho,* 8 Cal.App.3d 673, 678 [87 Cal.Rptr. 591].) The analogy was noted in *Coughlin* v. *Blair, supra,* 41 Cal.2d at page 598, where the court observed: "[*Spaulding* v. *Cameron*] would be in point here, if plaintiffs had obtained both damages for a total breach and a decree of specific performance requiring defendants to perform, or if defendants were still obliged to perform the contract."

[203 P.2d 778], in which the landlord failed to complete a building for the tenant, who nevertheless accepted the premises and sued for damages; the court held that the construction covenant was fully and finally breached and the tenant entitled to future as well as past damages.

The argument rests upon a misconception. The lease ran from the City of Stockton to Guntert, an individual. Although it recognized Guntert's wholly owned corporations as occupants and beneficiaries, the lease created only one tenancy, an undivided estate for years held by Guntert alone. The lease did not split the estate among joint or common tenants. As a contract, the lease remained in force following the breach. Guntert's decision to close down Construction Division as of November 1, 1973, did not metamorphose the partial breach into totality.

The award of prospective profits accruing through December 1979 offends another tenet of damage law—the requirement of reasonable certainty embodied in Civil Code section 3283. Sitting in judgment in February 1974 and facing a lease which did not finally expire until June 1981, the trial court indulged in a shaky prognostication—that Construction Division's plant could not be reopened or profitably utilized within the remaining years of tenancy. Guntert alone had made the decision to close down the plant. According to the findings, this decision was the natural and foreseeable consequence of the city's breach. Apparently the trial court viewed Guntert's decision as an expression of economic prudence dictated by prevailing uncertainties over outcome of the lawsuit. These uncertainties were put to rest in January 1975, with the finality of this court's decision sustaining injunctive relief. At that time Guntert and his two companies gained assurance of undisturbed occupancy of Banner Island until the end of the lease term (or until an earlier valid termination). Between January 1975 and the ultimate expiration of Guntert's tenancy lay approximately six years of undisturbed occupancy. With the hindsight now available, one views the prospective damage award as an unconditional subsidy, supplying a steady rate of profit to an idle manufacturing plant over a five-year period.

At this point the distinction between *Noble* v. *Tweedy, supra,* and the present case becomes obvious. There the landlord had indulged in a complete breach of the covenant to supply a building. Here, although there was a single breach, the damage arose from its impairment of the tenant's continuing right of quiet enjoyment. When the injunction

protected that continuing right against future interference, the tenant's entitlement to damage had to be reappraised.

Although the trial court found that plant closure was a natural foreseeable consequence of the breach, it did not find that reopening the plant would be uneconomical or unfeasible. Nor is there any evidence to support such a finding.[7] Realism suggests that a judgment guaranteeing a steady profit to an idle plant is a strong impetus to continued idleness. ▮▮▮ A claim for future damage may be maintained despite uncertainty of amount; it may not be maintained in the face of uncertainty as to its occurrence; a mere contingency will not support a claim for damages. (*Griffith Co.* v. *San Diego Col. for Women,* 45 Cal.2d 501, 516 [289 P.2d 476, 47 A.L.R.2d 1349]; *Campbell* v. *Magana,* 184 Cal.App.2d 751, 758 [8 Cal.Rptr. 32].)

▮▮▮ These two rules—one denying prospective damages for partial breach, the other denying contingent future damages—combine to invalidate that portion of the judgment awarding monthly "lost profits" commencing February 1974. The unavailability of prospective damages does not preclude future awards of past damages flowing from the partial breach. (See generally, 4 Corbin on Contracts, § 956.) Plaintiffs may, within the period of limitations, file a new lawsuit seeking additional damages; in the alternative, they may request the trial court in this case to reserve jurisdiction for the award of further damages. (See *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.,* 1 Cal.3d 586, 599 [83 Cal.Rptr. 418, 463 P.2d 770].) Future applications for additional damages will require plaintiffs to do everything reasonably possible to minimize their loss. (*Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 844 [147 P.2d 558].) Prolongation of Construction Division's plant closure after January 1975—when the injunction judgment became final—will be one of the elements bearing upon plaintiff's eligibility for award of additional damages for profit losses accruing after the December 1973 trial.

The judgment awarding damages to plaintiffs is sustained but must be reversed for the purpose of modifying the award of past damages to conform to the views expressed in this opinion. The award of prospective damages is reversed and the court is directed to reconsider in the light of

---

[7] Indeed, in November 1973 plaintiffs unsuccessfully sought a stipulation assuring them of 18 months' undisturbed tenancy to permit their acceptance of a major barge construction contract. Only a few months later, in February 1974, the trial court awarded prospective profit losses, implicitly premised upon the assumption that such business opportunities could be ignored or would no longer arise.

this opinion plaintiffs' claim for profit losses accruing subsequent to the December 1973 trial. Each side will bear its own costs on appeal.

Regan, J., and Evans, J., concurred.

Petitions for a rehearing were denied February 9, 1976, and the following opinion was then rendered:

**FRIEDMAN, Acting P. J.**—Both plaintiffs and the defendant City of Stockton have filed petitions for rehearing. Except at one point, neither petition evokes any need for modification or amplification of our opinion filed January 12, 1976. We do comment upon plaintiffs' criticism of that section of our opinion (headed by the numeral "VI") which nullified the trial court's damage award for loss of future profits at a fixed monthly rate commencing February 1974 and extending through December 1979.

It will be recalled that in November 1974 this court sustained the injunction which prevented the City of Stockton from terminating the leasehold of plaintiff Guntert. (*Guntert* v. *City of Stockton,* 43 Cal.App.3d 203 [117 Cal.Rptr. 601].) That decision on appeal became final in January 1975. The damage phase of the lawsuit went to trial in December 1973 and the judgment for damages was entered February 1974. The trial court judgment for monthly profit losses commencing February 1974 was prospective in relation to the time of the damage trial and entry of the damage judgment. We reverse that part of the judgment (a) because the breach of lease was only partial and did not entitle plaintiffs to prospective damages; (b) because the occurrence of future damages was contingent and uncertain.

In their petition for rehearing plaintiffs argue that we should have sustained the award of monthly profit losses at least until the time the injunction judgment became final, that is, until January 1975. Until then, plaintiffs had no assurance of a victorious lawsuit and no assurance of undisturbed occupancy of the site of their manufacturing plant. Until then, plaintiffs' uncertain prospects prevented them from accepting profitable, long-term business commitments. Thus, they assert, we should have affirmed the award of monthly profit losses at least through January 1975.

At this point plaintiffs overlook the fact that we were reviewing the judgment entered in February 1974, not January 1975. From the trial court's perspective in February 1974, these damages were prospective,

contingent and erroneous. It is not the province of an appellate court to make an original award of damages after nullifying an invalid, trial court award.

At this point too, plaintiffs overlook that portion of our opinion which pointed to the availability of remedies for damages which had been prospective at the time of trial. (*Ante,* p. 153.) Indeed, our decision directs the trial court to "reconsider in the light of this opinion plaintiffs' claim for profit losses accruing subsequent to the December 1973 trial." (*Ante,* pp. 153-154.)

In hearing any claim for damages accruing after December 1973, the trial court will have an opportunity to consider any defenses or reductions claimed by the City of Stockton.

Regan, J., and Evans, J., concurred.

The petitions of the appellant and the respondents for a hearing by the Supreme Court were denied April 22, 1976. Richardson, J., did not participate therein.